**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 08-23125 MER |
| MERCURY COMPANIES, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| MERCURY COMPANIES, INC., | ) | Adversary No. 10-01133 MER |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FNF SECURITY ACQUISITION, INC., | ) | |
| | ) | |
| Defendant/Counter-Claimant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FIDELITY NATIONAL TITLE COMPANY, | ) | Signed/Docketed |
| USA DIGITAL SOLUTIONS, INC., | ) | March 31, 2014 |
| AMERICAN HERITAGE TITLE | ) | |
| AGENCY, INC., and MERCURY | ) | |
| SERVICES OF UTAH, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Twenty-three days before filing its Chapter 11 bankruptcy petition, Plaintiff Mercury Companies, Inc. ("Mercury") sold several of its Colorado-based subsidiaries to Defendant FNF Security Acquisition, Inc. ("FNF").[1]  Mercury now seeks to recover the alleged value of the Colorado Subsidiaries as a fraudulent

---

[1]  Specifically, the sale involved the following Mercury subsidiaries:  Heritage Companies, Inc., Security Title Guaranty Co., Title America, Inc. and USA Digital Solutions, Inc., ("The Colorado Subsidiaries") which themselves owned all of the stock of 6 other sub-subsidiaries.  Except for USA Digital Solutions, Inc., all the Colorado Subsidiaries were engaged in the title business, and the Court will refer to those three subsidiaries as the "Title Companies."  In addition to purchaser FNF, Mercury named the following purchased subsidiaries as defendants in this matter: 1) Security Title Guaranty Co. (now known as Fidelity National Title Company); 2) USA Digital Solutions, Inc.; 3) American Heritage Title Agency, Inc. a/k/a First American Heritage Title Agency; 4) Mercury Settlement Services of Utah, Inc.; and 5) United Title Company, Inc.

transfer under 11 U.S.C. § 548.[2]  Mercury has also raised claims for breach of contract and recovery of payments made to the Colorado Subsidiaries as preferential transfers under § 547.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H) as it concerns proceedings to determine, avoid or recover preferences or fraudulent transfers.

## BACKGROUND FACTS[3]

In April 2008, Mercury executed a Credit Agreement with Comerica Bank ("Comerica") as part of a $45 million loan (the "Comerica Loan"). The Comerica Loan was secured by substantially all of Mercury's assets and the assets of its subsidiaries, including accounts receivable.  On July 25, 2008, Mercury's lenders swept Mercury's bank accounts and removed approximately $40 million of cash from those accounts.[4]  As a result of a variety of factors, including the sweep, on July 30, 2008, Mercury management made the decision to close numerous operating subsidiaries, ceased operations at 161 locations and began downsizing employees in California, Texas and Arizona.  With respect to the Colorado Subsidiaries, Mercury's only remaining operations, Mercury was anticipating a payroll of approximately $1.6 million coming due on August 6, 2008.

Prior to the sweep, the Colorado Subsidiaries had, roughly, a 30% market share in Colorado.  In other words, approximately 30% of all real estate transactions pending in Colorado were closed through the offices of one of the Colorado Subsidiaries.  This, in the minds of Mercury management, made the Colorado Subsidiaries an attractive candidate for acquisition.

---

[2]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[3]  The fact summary is taken primarily from the parties' list of stipulated facts in their Pretrial Statement.

[4]  *See* Pretrial Statement, Stipulated Facts, ¶¶ 7 and 8.  *See also* Transcript, February 27, 2013, p. 355, lines 3-5 (Testimony of Mr. William Walsh, Vice President and Controller of Mercury).  It is unclear exactly which bank swept the funds, since the Amended Complaint alleged the funds were held at US Bank, while other pleadings and the Stipulated Facts indicated the sweep was conducted by Comerica.  However, this fact is not material to the resolution of this matter, as the parties agree the sweep did take place and agree new bank accounts were established before the sale.

Mercury's first attempt was an offer to sell the Colorado Subsidiaries to their largest underwriter, First American Title ("First American"), for $1 million. First American refused, as they wanted to purchase only assets, not stock, and further, desired additional time for due diligence.  After failing to negotiate an immediate sale with First American, Mercury contacted FNF, another major national title insurance company, and proposed a sale of the stock in the Colorado Subsidiaries for $5 million.

After FNF representatives met and negotiated with Mercury management, the parties executed a Stock Purchase Agreement (the "SPA") on August 5, 2008.  The SPA called for a purchase price of $5 million to be paid in cash, and FNF immediately wired $1 million of the purchase price directly to Mercury.  FNF took control of the Colorado Subsidiaries on the same date, after Mercury timely delivered all the shares free of liens and claims.

On August 6, 2008, FNF wired an additional $1,484,004 toward the purchase price directly to Comerica Bank, satisfying Mercury's outstanding obligations to Comerica.  Comerica released any liens it had on the shares and the assets of the Subsidiaries.  After these payments, $2,515,996 of the purchase price remained outstanding, which amounts still have yet to be paid.

## DISCUSSION

### A.    Does Mercury Have Standing to Pursue this Adversary Proceeding?

The ability of a party to enforce a claim once held by the bankruptcy estate is limited to that which is retained under the terms of a confirmed chapter 11 plan, which constitutes a contract between a debtor and the creditors of the bankruptcy estate.[5]  The United States Court of Appeals for the Tenth Circuit recently reaffirmed its use of a two-step inquiry to determine standing to pursue post-confirmation claims:

> We determine whether a party has standing to enforce estate claims under § 1123(b)(3)(B) using the two-part test laid out in *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1326 (10th Cir. 1989).  First, we ask whether a confirmed plan expressly appointed the party to enforce the claims.  *Id.*  Second, we ask whether the appointed party qualifies as a representative of the estate.  *Id.*

---

[5]  *Connolly v. City of Houston (In re Western Integrated Networks, LLC)*, 322 B.R. 156, 166 (Bankr. D. Colo. 2005) (citing 11 U.S.C. § 1123(b)(3); *In re Lacy*, 304 B.R. 439, 444 (D. Colo. 2004); and *In re Pen Holdings, Inc.*, 316 B.R. 495, 500-501 (Bankr. M.D. Tenn. 2004)).

"The first element requires that the appointed party be approved by the court, which can be accomplished simply by approval of [a] plan" that expressly authorizes the party to prosecute claims post confirmation. *Retail Mktg. Co. v. King (In re Mako)*, 985 F.2d 1052, 1054 (10th Cir. 1993). SMDI does not dispute that the Liquidating Trustee was properly appointed by the Joint Plan to litigate the estate's claims in the AP. *See Paige*, 413 B.R. at 904–05.

In evaluating the second element—whether a party represents the estate—our "primary concern is whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly, the debtor's unsecured creditors." *Sweetwater*, 884 F.2d at 1327 (quotation omitted).[6]

The Confirmed Plan[7] at Sections 8.2(d)(ii) and (xvi), provides as follows:

d.  In addition to any other powers described in this Plan, the powers and duties of the Debtor shall include, all of which may be undertaken without Court approval:

>  ii.  To investigate and prosecute or abandon all Causes of Action belonging to or assertible by the Estate, including all Avoidance Claims. . . .

>  xiv.  To prosecute and/or settle the Adversary Proceeding brought by the Debtor against FNF Security Acquisition, Inc. (Adv. Proc. No. 10-01133 MER), including the authority to return the purchase price received in respect of the relevant entities if and to the extent FNF Security Acquisition, Inc. is determined to have been a good faith transferee of a fraudulent transfer. . .[8]

Thus, in this case, the Confirmed Plan clearly provides for Mercury, headed by Mr. Tom Connolly as CEO until entry of a final decree, to pursue this specific adversary proceeding.  In addition, recovery by Mercury would result in additional funds for the payment of creditors.  Therefore, the Court finds both

---

[6]  *Search Market Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1191-92 (10th Cir. 2012).

[7]  On December 13, 2010, the Court entered its Order Confirming Mercury's Chapter 11 Plan (Underlying Case Docket No. 2460).  This Order confirmed Mercury's Chapter 11 Plan (Underlying Case Docket No. 1679), as amended (Underlying Case Docket Nos. 2359 and 2442).

[8]  Confirmed Plan, Underlying Case Docket No. 1671, Sections 8.2(d)(ii) and (xiv).

elements of the *Paige* test have been met, and Mercury possesses standing to prosecute this matter.

**B.    Did the Sale of Stock in the Colorado Subsidiaries Constitute a Fraudulent Transfer Under Section 548(a)(1)?**

Section 548(a)(1) provides:

The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was . . . indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer[.][9]

Thus, a trustee (or, as in this case, the named agent under a confirmed plan), may recover, from the transferee, any transfer made by the debtor within two years of filing of the bankruptcy petition, if the debtor either:  1) actually intended to defraud creditors in making the transfer ("actual" fraud); or, as alleged here, 2) received less than "a reasonably equivalent value" in exchange, and was insolvent when the transfer was made ("constructive" fraud).[10] Mercury, as the party seeking to avoid the transfer as constructively fraudulent under § 548(a)(1)(B), bears the burden of proof by a preponderance of the evidence.[11]

---

[9]   Section 548(a)(1).

[10]   *See Wadsworth v. Word of Life Christian Center (In re McGough)*, 467 B.R. 220, 224 (10th Cir. BAP 2012) (reversed and remanded on other grounds, 737 F.3d 1268 (10th Cir. 2013)).

[11]   *Weinman v. Walker (In re Adam Aircraft Industries, Inc.)*, 493 B.R. 834, 845 (Bankr. D. Colo. 2013).

The parties agree Mercury was insolvent on the date of the transfer. Thus, the remaining question is whether Mercury received reasonably equivalent value for the stock in the Colorado Subsidiaries.

          *1.    The Court Considers Expert Testimony Useful in Evaluating Reasonably Equivalent Value, But Finds It Is Not Determinative.*

Mr. Neil H. Demchick ("Demchick"), Mercury's expert, and Mr. Scott P. Peltz ("Peltz"), FNF's expert, while agreeing on many points in reaching their opinions of the value of the stock in the Colorado Subsidaries, nonetheless reached vastly different conclusions. As of the date of the sale, August 5, 2008, Peltz opined the stock had a negative value of approximately $5 million. By contrast, Demchick opined that the stock of the Colorado Subsidiaries on that same date had a positive value of $14,676,408.

Both experts agreed the income approach was the preferred valuation method. In addition, both experts valued the Title Companies (Heritage Companies, Inc.; Security Title Guaranty Co.; and Title America, Inc.) differently from USA Digital Solutions, based on the differing nature of these businesses. Further, both experts used a "going concern" value because the Colorado Subsidiaries were operating entities at the time of sale.

The experts noted the income approach consists of estimating future ownership benefits of property and discounting those benefits to a present value using an appropriate discount rate, thus accounting for the time value of money. In calculating value under the income approach, both Demchick and Peltz used the discounted cash flow methodology for the Title Companies. Specifically, they projected the Title Companies' revenues and expenses in the future, then discounted the revenues and expenses back to a present value as of the date of the sale.

Demchick and Peltz projected revenue growth of 0.1% in 2009 and 6.4% in 2010 based on national forecasts, and both assumed 3.0% growth for 2011 and all subsequent years. However, they differed in their forecast for 2008 following the sale.

Demchick believed the Colorado Subsidiaries could have continued operations for 30 to 60 days to get to a sale, and used that assumption in assigning a fair market value. Peltz, on the other hand, based his valuation in part on the fact the sale took place on an immediate basis.

Demchick used data from income statements obtained from the Title Companies for January 2004 through July 2008. He concluded the Title Companies' revenue was mainly comprised of title revenue and escrow

revenue.[12]  In addition, he explained the Title Companies have access to "earned credits" because title companies generally hold large amounts of trust funds at financial institutions, based on the escrow services they provide.  In Colorado, financial institutions may not pay interest on such funds because the funds do not belong to the title companies.  Instead, financial institutions give earned credits, which title companies use to purchase in-kind merchandise and reduce expenses.  Demchick stated the amount of earned credits depends on: 1) levels of revenue and, therefore, the escrow funds maintained at financial institutions; and 2) interest rates in the marketplace.  As interest rates decline, earned credits also decline and *vice versa*.

Demchick further noted the Title Companies experienced growth through 2005, peaked in 2005, and began declining in 2006.  Demchick  explained there is no information for Colorado alone, so he, as well as Peltz, relied on four national studies of existing home sales and mortgage origination in preparing their projections.  Consistent with the national data, the Title Companies' operations expanded until 2005 and declined in 2006 through 2007.

According to Demchick the fair market value of the title companies equals 1) the net present value of the title companies during the projection period, plus 2) the terminal value of the title companies, less 3) necessary adjustments, such as dark office liability[13] adjustments and working capital adjustments, less 4) discount for marketability of the Title companies.

Demchick took financial data from January through July 2008 as to net income, and deducted capital expenses and required increases in working capital.  He added depreciation back to the figure, as he noted depreciation is a non-cash expense.  This provided a cash flow number.

To address projected future cash flow, Demchick took projections for 2009 through 2012, deducted potential future dark office liability, and adjusted for the Weighted Average Cost of Capital ("WACC").  This was obtained from an industry document known as Ibbotson Cost of Capital.[14]

Demchick used a different capital structure from Ibbotson than did Peltz, resulting in a cost of capital of 30.28% of debt, and based his projections on the

---

[12]  Title revenue is premiums charged to customers for title insurance.  Escrow revenue comes from escrow fees, closing fees, and documentation fees.

[13]  Demchick stated "[d]ark office liability would represent the liability related to a location and an office facility that's dark, basically not being used, not being considered, not being operated."  Transcript, May 1, 2013, p. 1521, line 25 - p. 1522, line 3.

[14]  Defendants' Exhibit 9H.

current year median and the five-year average.  By contrast, Peltz used a capital structure resulting in 6.38% of debt, and used the current year mean figures.  As to cost of equity, Demchick used 22.8%, and Peltz used 25.5%.[15]  Because they used different capital structures, Demchick and Peltz reached different results when they calculated the weighted costs of debt and equity.

Mercury criticized Peltz for confusing "shadow revenue" with seasonality of the business.[16]  The Court finds this argument to be well-founded.  Peltz defended his use of management projections prepared before the Comerica sweep.[17]  He opined these projections had historically been overly optimistic, and testified Mercury's management agreed with his opinion, and conceded a projected decline in revenues should be closer to 30% to 40%, rather than the approximately 22% Peltz obtained from their projections.[18]  However, he continued to use his previous rate because he believed other factors balanced his earlier exclusion of shadow revenue from the projections.[19]  The Court finds this approach to be inappropriate, making Peltz's conclusion of "negative" value for the Colorado Subsidiaries less reliable.

In addition, Mercury alleges Peltz should have not taken a lost business adjustment to account for the effect of Comerica's sweep.  However, the Court

---

[15]  Defendants' Exhibit 9A, Mercury's Exhibit 148, slide 38.

[16]  According to Mercury, "shadow revenue" was an accounting mechanism designed to encourage the Title companies to refer business to Mercury's non-Colorado subsidiaries.  If such a referral was made, both subsidiaries would received credit for revenue generated on their income statements, entitling both subsidiaries to a commission from Mercury.  At the end of each year, the "shadow revenue" of the Title companies would be deducted from their income statements to prevent "double booking" of revenue.  *See* Transcript, February 28, 2013, p. 391, line 12 – p. 398, line 3, testimony of William Walsh, Vice President and Controller of Mercury.  In addition, Mr. Walsh testified there was seasonality to the title business.  *Id.*, p. 390, lines 13-21.  However, he clearly distinguished seasonality from "shadow revenue."

[17]  Defendants' Exhibit E.

[18]  Transcript, May 2, 2013, p. 1739, lines 6-17.

[19]  Transcript, May 2, 2013, p. 1762, lines 7-14.  In response to the question why he did not change his opinion after learning receiving information about shadow revenue, Peltz stated:

I had not considered this computation in a vacuum to start with.  I looked at the fact that they had closed offices, laid off people and other factors that suggested that there would be a significant decrease between the first six months and the next six months.  In addition, I went back and looked at 2007 first six months compared to last six months without shadow revenue, and the decrease between those two was 22 percent. So I saw no reason to change my opinion.

finds this criticism is not well-placed, since the fear of lost business was significant factor in Hauptman's decision to offer the stock of the Colorado Subsidiaries for $5 million and press for an immediate sale.

Mercury also disagrees with Peltz's reduction of earned credits, assuming no mitigation for the liability associated with 33 dark offices.  The Court also finds this disagreement is not well-founded.  Mercury's witnesses opined it was possible the dark offices could be sublet and not be a drain on revenue, but did not present specific evidence of such subleases or the market conditions for such subleases in the areas of the dark offices.  Moreover, in his statement presented to the United States District Court for the District of Colorado on August 6, 2008, Hauptman stated when he offered to sell the Colorado Subsidiaries to First American, First American refused to pay for leases on dark offices.[20]

In addition to specific disputes, Mercury's underlying criticism of Peltz's valuation is he used the subjective "fair value" basis, instead of the objective "fair market value" basis, for his conclusion of value.  However, much of Mercury's framework for arguing a value of approximately $15 million is based on its own subjective and inaccurate beliefs, which prevented it from obtaining the higher price.  Mercury maintains the difference between the parties' contract price and Demchick's valuation stems from such subjective factors as Hauptman's mistaken understanding of the cash available and the possible actions of the Colorado Department of Insurance, as well as what Mercury contends is FNF's subjective unfairness in taking advantage of a good deal arising from these mistaken understandings.

Both Demchick and Peltz calculated the unadjusted fair market value of the Title Companies using the Gordon Growth Model for Terminal Value.[21] Demchick obtained an unadjusted fair market value of $28,734,000, then adjusted for dark office liability, working capital shortfall existing on August 5, 2008, and lack of marketability because Mercury was a closely-held company.[22] However, he accounted for the fact that 100%, or a controlling interest, of the stock was being transferred, and got an adjusted fair market value for the Title companies of $14,676,408, to which he added the value of USA Digital, a software and computer consulting company he valued at $289,976.[23]

---

[20]  Defendants' Exhibit D, ¶ 15.

[21]  Mercury's Exhibit 150.

[22]  *See* Defendants' Exhibit 7L.

[23]  Mercury's Exhibit 148, slide 46.  Demchick also obtained a higher value, $1,885,268, for USA Digital using the market approach, but adopted the fair market value approach. The Court's conclusions below make finding a specific dollar value for this

Thus, Demchick's analysis values the Colorado Subsidiaries as going concerns, but considers the value based on a non-immediate sale. The Court agrees the sale price might have been higher if Mercury had not been insistent on an immediate sale, but it is not clear whether it would have been $10 million higher than the parties' agreed upon price, as asserted by Demchick.

As for Peltz's analysis, despite the Court's disagreement with his manner of "making up" for excluding "shadow revenue," the Court finds he properly considered the immediacy of the sale and admitted he considered financial distress of Mercury in arriving at value. However, in considering the "willing buyer and willing seller" viewpoint of fair market value, he did not account for the undisputed facts FNF was willing to enter into a contract to pay $5 million for the Colorado Subsidiaries, and considered the transaction a good deal. Therefore, Demchick's valuation of the Colorado Subsidiaries appears excessive because of his failure to take into account the circumstances of the sale, while Peltz's assignment of negative value to the Colorado Subsidiaries appears too low, because the circumstances of the sale indicate value was indeed present. For these reasons, the Court finds the experts' valuations, as discussed above, to be useful but not determinative as to value.

2. *The Court May Consider, and Does Consider, the Totality of the Circumstances in Determining Reasonably Equivalent Value.*

In the determination of reasonably equivalent value, Mercury asserts the Court should consider only the contract price and the value of the property, excluding evidence of good faith and arm's length dealing. However, FNF contends it proceeded in good faith in the transaction, and the facts and circumstances surrounding the sale indicate the price was fair under the circumstances.

The Court of Appeals for the Third Circuit described the determination of reasonably equivalent value in detail:

> Before considering a plaintiff's obligation to define with precision the value surrendered and gained as a result of a transfer, we need to understand the general structure of the reasonably equivalent value analysis. We have interpreted "value" to include "any benefit[,] . . . whether direct or indirect." *R.M.L.*, 92 F.3d at 150. As noted above, "the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the [Bankruptcy] Code." *Id.* at 148. Thus, Fruehauf [the Debtor] gave up something of value when the Board ratified the Third Amendment.

---

company unnecessary. However, the Court finds no reason to disbelieve Demchick's estimate for USA Digital.

The next question is whether the debtor received any value from the transfer. *See id.* at 149-50. **Although, as explained below, the "totality of the circumstances" is considered in determining whether the values surrendered and gained as a result of a transfer are reasonably equivalent, a court should not consider the "totality of the circumstances" in evaluating the threshold question of whether any value was received at all.** *Id.* at 150. Rather, a court must consider whether, "based on the circumstances that existed at the time" of the transfer, it was "legitimate and reasonable" to expect some value accruing to the debtor. *Id.* at 152 (internal quotation marks and emphasis omitted).

. . .

**If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave.** *See* 11 U.S.C. § 548(a)(1)(A); *Metro Commc'ns*, 945 F.2d at 647. In conducting this factual analysis, a court does look to the "totality of the circumstances," including (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's-length relationship between the debtor and the transferee," and (3) the transferee's good faith. *R.M.L.*, 92 F.3d at 148-49, 153.

. . . .

As noted above, "[t]he value of consideration received must be compared to the value given by the debtor." *Metro Commc'ns*, 945 F.2d at 648. Calculating "direct" benefits (such as an investment of cash that yields a cash return) is typically easy, but becomes more difficult when benefits are "indirect." *See R.M.L.*, 92 F.3d at 148. Nonetheless, "[t]hese indirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred." *Metro Commc'ns*, 945 F.2d at 647; *see In re Richards & Conover Steel Co.*, 267 B.R. 602, 612 (8th Cir. BAP 2001) ("[I]n deciding whether value has been transferred the court must examine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect." (citation and internal quotation marks omitted)); *In re BCP Mgmt., Inc.*, 320 B.R. 265, 280 (Bankr. D. Del. 2005) (same, citing *Metro Communications*).[24]

---

[24] *Pension Transfer Corp. v. Beneficiaries (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-213 (3rd Cir. 2006) (emphasis added). *See also, Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997) (The factors utilized to review reasonably equivalent value are: 1) whether the value of what was transferred is equal to the value of what was received; 2) the fair market value of what was transferred and received; 3) whether the transaction took

Here, there is no question that some value was received in the form of the payments made by FNF.  The Court may then, under *Fruehauf*, address reasonably equivalent value using not only the contract price and appraisals of value, but the circumstances surrounding the transaction.  Moreover, *Fruehauf* indicates "indirect" or non-economic benefits may be considered in determining the value transferred.

Similarly, in *Grochocinski v. Knippen (In re Knippen)*, also discussed by both Mercury and FNF, the Bankruptcy Court for the Northern District of Illinois stated:

> [D]etermination of "reasonably equivalent value" under § 548(a)(1)(B) is a two-step process.  *Anand v. Nat'l Republic Bank of Chi.*, 239 B.R. 511, 516–17 (N.D. Ill. 1999).  A court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up.  *Id.* at 517.  The second inquiry, whether what the debtor gave up was reasonably equivalent to what he received, is more difficult.  *Id.* "Equivalent value must be measured as of the time of the transfer." *McCook Metals*, 319 B.R. at 589.

> Whether "reasonably equivalent value" has been given is a question of fact that depends on the circumstances surrounding the transaction. *Barber*, 129 F.3d at 387.  The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.*; *Grigsby v. Carmell (In re Apex Auto. Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999).  The Trustee bears the burden of proof on this issue.  *See Barber*, 129 F.3d at 387.[25]

---

place at arm's length; and 4) the good faith of the transferee.).  Both Mercury and FNF relied on these cases in arguing their positions.

[25] *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 726 (Bankr. N.D. Ill. 2006).  *See also, Kaler v. Red River Commodities, Inc. (In re Sun Valley Products, Inc.)*, 328 B.R. 147,156-157 (Bankr. D. N.D. 2005), in which the Court stated:

> Outside the foreclosure context, fair market value is the benchmark for determining reasonably equivalent value. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *see also Dullea Land Co. v. Ideal Ag Corp. ( In re Dullea Land Co.)*, 2001 WL 1892189, at *7 (Bankr. D. N.D. 2001).  Whether a transfer is made in exchange for reasonably equivalent value is a question of fact requiring the court to consider all factors bearing value in the marketplace. *Armstrong v. United Bank of Bismarck ( In re Bob's Sea Ray Boats,*

More recently, the Bankruptcy Court for the Southern District of New York has also used a "totality of the circumstances" approach to reasonably equivalent value:

> In contrast to its definition of "value," Congress left it to the courts to mark the scope and meaning of the term "reasonably equivalent." *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990). To determine reasonably equivalent value, courts examine the totality of the circumstances surrounding the transfer in question. *Id.* at 467; *see also Pereira v. Wells Fargo Bank, N.A. ( In re Gonzalez )*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006). "The 'totality of the circumstances' inquiry considers three factors: (i) the fair market value of the economic benefit received by the debtor; (ii) the arms-length nature of the transaction; and (iii) the good faith of the transferee." *Gonzalez*, 342 B.R. at 173 (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. ( In re R.M.L.)*, 92 F.3d 139, 149 (3rd Cir. 1996)); *see also Morris Communications*, 914 F.2d at 467. Because fraudulent conveyance laws are intended to protect a debtor's creditors, the analysis of reasonable value must be determined from the creditors' standpoint. *See Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002) (quoting *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3rd Cir. 1991)).
>
> The value received by a debtor does not need to be a "penny for penny exchange," but can be " 'roughly' the value of the transfer made." *Gonzalez*, 342 B.R. at 173. The value is presumptively less

---

*Inc.*), 144 B.R. 451, 457 (Bankr. D. N.D. 1992); *see also Jacoway v. Anderson (In re Ozark Restaurant Equipment Co.)*, 850 F.2d 342, 344–45 (8th Cir. 1988) (stating that the reasonable equivalent value analysis in fraudulent transfer cases requires consideration of "the entire situation" including market conditions); *In re Northgate Computer Sys., Inc.*, 240 B.R. 328 (Bankr. D. Minn. 1999) (noting that the issue of whether debtor received reasonably equivalent value is fundamentally one of common sense, measured against market reality). "Despite lip service given to the weighing of other factors," often there is nothing to consider beyond simply comparing the fair market value of what the debtor transferred against the fair market value of what the debtor received. *First Federal Sav. & Loan Ass'n of Bismarck v. Hulm ( In re Hulm )*, 45 B.R. 523, 528 (Bankr. D.N.D. 1984). If the two values are reasonably similar, no fraudulent transfer has taken place. *See* 11 U.S.C. § 548(a)(1)(B)(i).

Other factors courts weighed in the consideration include the good faith of the parties, the difference between the amount paid and the fair market value, the percentage the amount paid is of fair market value, and whether the transaction was an arm's length transaction between a willing buyer and a willing seller. *See Cooper v. Ashley Communications, Inc. ( In re Morris Communications ND, Inc.)*, 914 F.2d 458, 467 (4th Cir. 1990).

than a reasonably equivalent value if it is "so low that it shocks the conscience." *Id.* Courts give "significant deference to marketplace values" and to values reached in the context of "an arm's length transaction between a willing buyer and a willing seller." *See Peltz*, 279 B.R. at 737–38.[26]

Mercury argues strenuously against good faith as a <u>requirement</u> for reasonably equivalent value. This Court agrees. However, good faith and arm's length dealing can be considered as a <u>component</u> of the total circumstances surrounding a transaction for purposes of addressing reasonably equivalent value.

Alternatively, Mercury argues FNF could not have been proceeding in good faith, because it knew of Mercury's insolvency and possible avoidability of the transaction at the time of the sale. The Court disagrees. The mere knowledge Mercury was distressed and desired to obtain an immediate sale did not necessarily give FNF knowledge of a later-filed bankruptcy and avoidance suit, nor does it necessarily lead to the conclusion FNF did not proceed in good faith. The cases cited by Mercury indicate there are instances where knowledge of a debtor's financial distress or insolvency might prevent a finding of good faith in a sales transaction, but do not establish the "bright line rule" urged by Mercury.[27]

---

[26]  *Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013).

[27]  The Court in *Brown v. First National Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir. 1995) addressed a Chapter 7 trustee suit against the debtors' parents and a bank seeking to avoid as fraudulent transfer of twelve properties from the debtors to the parents that were subject to bank's liens. The Court upheld the avoidance of the transfers under the "actual fraud" provisions of § 548(a)(1)(A), and the denial of the defendants' defense of good faith under § 528(c), stating:

> Neither the Bankruptcy Code, nor its legislative history, defines knowledge as used in § 550(b)(1). *Smith v. Mixon*, 788 F.2d 229, 232 (4th Cir. 1986). "No one supposes that 'knowledge of voidability' means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do." *Bonded Fin. Servs.*, 838 F.2d at 898 (citations omitted). However, knowledge is a stronger term than notice, and we do not require a transferee to be a vigilant monitor for the creditors' benefit when he possesses no information suggesting that there is a fraudulent conveyance in the chain. *Id.* Accordingly, we believe that a transferee has knowledge if he "knew facts that would lead a reasonable person to believe that the property transferred was recoverable." *In re Nordic Village, Inc.*, 915 F.2d 1049, 1055 (6th Cir. 1990) (quoting *Smith*, 788 F.2d at 232 n. 2), *rev'd on other grounds sub nom. United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). In this vein, some facts suggest the underlying presence of other facts. If a transferee possesses knowledge of facts that suggest a transfer may be

Further, the Court notes an objective standard shall be used when addressing whether a transferee may assert a defense of good faith under § 548(c).[28]  This standard requires a two-part inquiry: 1) whether the "circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose," and 2) if so, whether "a diligent inquiry would have discovered the fraudulent purpose."[29]  Accordingly, there is no *per se* standard.[30]  Therefore, the Court declines to adopt a bright-line rule where mere knowledge

---

fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge.  In such a situation, the transferee is held to have knowledge of the voidability of the transfer.  *In re Agricultural Research & Technology Group, 916 F.2d at 536; Bonded Fin. Servs.*, 838 F.2d at 898; *In re Goodwin*, 115 B.R. 674, 677 (Bankr. C.D. Cal. 1990).

*Id.* at 1357.  The Court did not establish a *per se* rule, and based part of its conclusion on the fact that "badges of fraud" were present which the defendant bank ignored.  In the case at bar, there is no insider transaction, and Mercury seeks avoidance under constructive fraud, not actual fraud; therefore no badges of fraud have been shown.  The findings of the *Sherman* Court, therefore, simply lend support to this Court's conclusion that the circumstances of a transfer, not merely the value of the transferred property, must be carefully examined.

Similarly, in *Burtch v. Masiz (In re Vaso Active Pharmaceuticals, Inc.)*, 2012 WL 4793241, at *20 (Bankr. D. Del. Oct. 9, 2012), the Court found insider purchasers knew litigation was a debtor's only asset, and thus found the purchasers could not be found to have entered the purchase agreement in good faith.  However, earlier in the opinion, in setting up its analysis of reasonably equivalent value, the Court stated:

The term 'reasonably equivalent value' is not defined by the Bankruptcy Code. Congress left to the courts the task of setting forth the scope and meaning of this term, and courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence.  As the Third Circuit has noted, a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave.  [Courts] look to the "totality of the circumstances" of the transfer to determine whether 'reasonably equivalent' value was given.

*Id.* (citation to deposition documents and internal quotation marks omitted).  The Court therefore does not believe *Burtch* establishes a *per se* rule, and notes in the case at bar, the sale was not to an insider, and the nature of the property transferred was quite different.

[28]  *Jobin v. McKay (In re M & L Business Machine Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).

[29]  *Id.*

[30]  *See Wagner v. Ultima Homes, Inc. (In re Vaughn Co., Realtors)*, 493 B.R. 597, 610 (Bankr. D. N.M. 2013).  *See also Soifer v. Bozarth (In re Lydia Cladek, Inc.)*, 494 B.R. 555, 561 (Bankr. M.D. Fla. 2013) (citing *Vaughn Co.*).

of a seller's financial distress (and hence, desire to sell property) prevents a finding of a good faith transfer.

In this case, the evidence indicates Mercury's officers held an incorrect belief the sweep required immediate sale of the Colorado Subsidiaries. First, the belief Mercury lacked the cash to cover the August 6, 2008 payroll was wrong, because Mercury had access to cash.[31] Only one day after the sale, at the August 6, 2008 hearing before the United States District Court for the District of Colorado on First American's motion for an injunction preventing the sale to FNF, Hauptman presented the following in an affidavit:

> Mercury owns an interest in a home developer and "land bank." The appraised value of the land held by this subsidiary is $20 million more than the debt against that property. Accordingly, Mercury's interest in that subsidiary may be worth well in excess of $10 million. Second, Mercury owns an aircraft worth approximately $3 million. In addition, Mercury holds substantial cash that because of its nature, it did not try to use as working capital. In particular, Mercury holds $13 million in a nonqualified deferred compensation plan (which is property of Mercury). It has also over funded its health and benefits plan by approximately $4 million.[32]

Similarly, in the trial before this Court, Hauptman indicated the $13 million in the deferred compensation account and $4 million in the health and benefits account could have been used to meet the August 6, 2008 payroll.[33]

Further, Mercury mistakenly believed the Colorado Department of Insurance would close Mercury on the date the Department's requested information was due. Specifically, Mercury's regulatory specialist, Mr. Hon Chan, informed Mercury's general counsel, Carol McConville ("McConville") he had met with the Department on July 30, 2008. At this meeting "Commissioner Morrison indicated that the Department of Insurance very much wants the Mercury Companies to remain viable and to continue to do business in Colorado, and wants to work with us to achieve this."[34]

---

[31] *See* Mercury's Exhibits 2, 3, 23, and 24, showing $13 million available in deferred compensation accounts. *See also* Mercury's Exhibit 29, indicating cash available in its account at Centennial Bank.

[32] *See* Defendants' Exhibit D, ¶ 24, Declaration of Jerrold Hauptman.

[33] Transcript February 26, 2013, p. 194, line 8 - p. 195, line 4.

[34] Defendants' Exhibit 3V, Email from Hon Chan to Carol McConville dated July 31, 2008.

What Mercury's witnesses did not address, however, is why they, as experienced business people, acted on mistaken beliefs rather than engaging in due diligence to obtain accurate information. For example, Mercury did not verify what funds they had available after the Comerica sweep, or seek additional information as to the process of the Colorado Department of Insurance. Rather, the evidence reveals Mercury, and in particular Hauptman, simply panicked. Hauptman asserted his financial officer and his banking contact were out of the country. It is less than plausible that an experienced businessman would proceed to sell the company based on faulty or confused information, when the companies were in "chaos,"[35] without at least consulting with junior financial officers or bank representatives.

Moreover, while concern about meeting payroll on August 6, 2008, may have seemed legitimate to Mercury's officers at the time, this concern does not explain how Mercury's in-house record-keeping missed the cash available after the Comerica sweep. Hauptman's affidavit presented on August 6, 2008, in fact indicated he knew of such cash.

What is apparent from the evidence is Hauptman desired an immediate sale. Hauptman initiated contact with First American during litigation with the same, offering to sell the Colorado Subsidiaries for $1 million. First American refused, and wanted to purchase only assets, not stock, and desired additional time for due diligence. It was only after failing to negotiate an immediate sale with First American that Hauptman contacted FNF and proposed to sell them the stock in the Colorado Subsidiaries for $5 million. Importantly, Hauptman, not FNF, suggested a $5 million purchase price. Hauptman arrived at this figure explaining "if they [FNF] could buy these companies at a substantial discount, they would be inclined to move quickly."[36] In fact, when FNF, like First American, requested time to conduct due diligence, Hauptman refused, stating there was no time for "haggling."[37] Thus, Hauptman received the desired goal of a quick sale.

In hindsight, Mercury attempts to argue its officers' unwarranted panic somehow translates to coercion and sharp dealing by FNF. On the contrary, the information Hauptman used to construct his affidavit and the information available to McConville about the Colorado Department of Insurance indicates the panic was unnecessary and not a result of acts by FNF. Thus, Mercury's assertion of coercion and sharp dealing is unsupported by the evidence. Mercury chose to proceed ignoring certain information or knowing it had

---

[35] Transcript February 26, 2013, p. 194, lines 8-12.

[36] Transcript, p. 164, lines 12-14, February 26, 2013.

[37] Transcript, p. 325, lines 5-13, February 27, 2013.

inadequate information, and chose to offer FNF the stock in the Colorado Subsidiaries for $5 million to obtain an immediate sale.

Thus, while the Court believes the detailed testimony of the expert witnesses provides a helpful framework for evaluating the transaction, it also notes the facts of this situation support a finding of a willing seller offering to sell a valuable asset as a discount to get to a quick closing, and a buyer willing to forego a more typical, protracted "due diligence" process to receive the valuable asset at a discounted price.  These facts are indicative of the "willing buyer and willing seller, negotiating at arms length with no coercion" and support a finding of fair market value.

The parties agree fair market value is the "amount at which property would change hands between an willing buyer and a willing seller if neither is under compulsion and both have reasonable knowledge of the relevant facts."[38] As noted above, the fact Mercury wanted a quick sale and offered a discounted price to get it does not remove the transaction from the realm of fair market value.  Mercury had the ability to ask for more time.  Mercury had cash to use to pay payroll and knew at or near the time of the sale the cash was in accounts not affected by the bank sweep.  Mercury had the ability to conduct additional research into what the Colorado Subsidiaries actually owned.[39]  It did none of these things.  No authority has been presented to suggest FNF had a duty to ask if Mercury, who had approached FNF, was really certain it wanted to sell the Colorado Subsidiaries.

For these reasons, considering the totality of the circumstances in this case, the Court finds the sale of the Colorado Subsidiaries was conducted in good faith and for reasonably equivalent value.  Therefore, the sale may not be avoided under § 548.

## C.     Did FNF Breach the Parties' Contract or Breach the Implied Covenant of Good Faith and Fair Dealing?

Pursuant to paragraph 12 of the SPA, Delaware law is controlling.[40]  To show breach of contract under Delaware law, a plaintiff must demonstrate:  1) a contractual obligation;  2) a breach of the obligation by the defendant;  and

---

[38]  *See* Mercury's Exhibit 148.

[39]  Mercury makes much of the fact the Colorado Subsidiaries owned a title agency in Oregon, and cash in their own bank accounts of which Mercury and FNF were unaware at the time of the sale.  However, had Mercury requested more time or given FNF more time, this information might have been discovered.  However, Mercury chose not to do so.

[40]  Defendants' Exhibit A, Stock Purchase Agreement, p. 7, ¶ 12.

3) resulting damage to the plaintiff.[41]  In addition, Delaware law recognizes a covenant of good faith and fair dealing which "inheres in every contract" governed by Delaware law and requires parties to a contract to avoid unreasonable or arbitrary actions which prevent the other party from receiving the "fruits of the bargain."[42]

In this case, the SPA provided for a $5 million purchase price for the shares in the Colorado Subsidiaries, with $1 million to be delivered to Mercury upon execution of the SPA, and the balance paid as follows:

> 3.    Seller Post-Closing Deliverables; Payment of Deferred Portion fo Purchase Price.  On or before August 19, 2008. Seller will deliver the following to Buyer (together, the "Schedules"):
>
> 3.1    A schedule of the location fo each office in which any of the Purchased Companies conducts any business.
>
> 3.2    A schedule of each employee of any of the Purchased Companies, including job title, current compensation, office location and full or part-time status.
>
> 3.3    A schedule of all employee health and other benefit plans available to any employee of the Purchased Companies, and copies of all documentation related to such plans.
>
> 3.4    A schedule of all liabilities of the Purchased Companies in excess of $50,000.
>
> 3.5    A schedule of all actions, suits, arbitration proceedings, investigations, inquiries or other proceedings whether governmental or non-governmental, before any governmental authority that is pending or, to the knowledge of the Seller, threatened, against, relating to or affecting any of the Purchased Companies or any of their subsidiaries, or any officer, director or employee thereof in his or her capacity as such, or any of its or their respective assets, properties or businesses, and

---

[41] *Greenstar, LLC v. Heller*, 814 F.Supp.2d 444, 450 (D. Del. 2011); *VLIW Tech, LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) (Not Reported in A.3d).

[42] *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636 (Del. Ch. 2011).

    setting forth, as to each matter identified therein, the names of the parties thereto, the forum for such matter and a summary of the details of the matter.

3.6    Certificates representing the Shares, accompanied by stock powers endorsed in blank.

3.7    Evidence reasonably satisfactory to Buyer from Comerica Bank, as agent under Seller's credit facility, that all liens on the shares and the assets of the Purchased Companies and their subsidiaries have been released.

3.8    A list of all intellectual property of the Purchased Companies and their subsidiaries, including software, computer systems, copyrights, and trade secrets.

Buyer will promptly review the Schedules upon delivery, and Buyer and Seller will work together in good faith to revise the Schedules to the extent appropriate based on Buyer's review as soon as practicably but in no event later than the 14th day following delivery of the Schedules.  Upon Buyer's indication of satisfaction with the Schedules, which indication will not be unreasonably withheld, and the accuracy of Seller's representations and warranties contained herein, Buyer will pay the balance of the Purchase Price to Seller.[43]

Mercury made certain representations in the SPA, including the following statement, offering support for its refusal to pay the remaining sales price: "Seller has delivered to Buyer the financial statements of the Purchased Companies. . . . The Financial Statement fairly present the financial condition and results of operations of the Purchased Companies as of the date thereof and for the periods covered thereby."[44]  FNF asserts this statement is inaccurate.

Moreover, FNF represented in the SPA, *inter alia*, the following:

5.1    Buyer acknowledges that the Shares have not been registered under the federal Securities act of 1933, as amended, or any state securities law, and that none of the Purchased Companies is a publicly traded company. Buyer understands that there is not nor may there ever be a public market where it can sell the Shares.

---

[43] Mercury's Exhibit A, Stock Purchase Agreement, pp. 1-2, ¶ 3.

[44] *Id.*, p. 4, ¶ 4.8.

    5.2    Buyer has had the opportunity to ask question of and receive answers or obtain additional information concerning the financial and other affairs of the Purchased Companies and their subsidiaries, and Buyer has asked such questions and received satisfactory answers.

    5.3    Buyer is familiar with the business in which the Purchased Companies are engaged, and is fully aware of the problems and risks involved in making an investment of this type and is capable of evaluating the merits and risks of this investment.[45]

FNF asserts it did not pay the balance of the purchase price because neither the financial statements nor the subsequent schedules presented by Mercury disclosed approximately $8.6 million in dark office liabilities, nor did they disclose approximately $3.8 million in contingent liabilities potentially owed by the Colorado Subsidiaries.[46]  FNF does not dispute a contract existed, nor that it has not paid the balance of the contract price.  Rather, it appears to rely on Delaware law indicating "a party [to a contract] is excused from performance . . . if the other party is in material breach" of contractual obligations.[47]

Here, the evidence does not show Mercury materially breached its obligations under the SPA.  Rather, the evidence demonstrates both parties knew they were proceeding on a truncated schedule of due diligence to assure an immediate closing.  As noted above, each party made representations in the SPA, but Section 3.8 recognized Mercury was required to provide additional information, and FNF was required to work with Mercury to make sure such information was acceptable.  No provision stated FNF could withhold the balance of the purchase price if it found the information lacking or inaccurate.

In addition, the testimony at trial indicates FNF was aware of dark office liability and had an opportunity to inquire about it and other possible contingent liabilities before closing on the SPA.  Specifically, Mr. Roger Jewkes, FNF's president of western operations, testified he was not expecting to do any more

---

[45]  Mercury's Exhibit A, Stock Purchase Agreement, pp. 14-5, ¶ 5.

[46]  *See* Mercury's Exhibit 5Z, p.3.  *See also*, Mercury's Exhibits 12, 12U, 14A, 14B, 14T, 15E, 15L, 15W, 21F, 22Z, 23A, 23C, 23E, 23M, 23O, and 23U (indicating continent liabilities by the Colorado Subsidiaries on offices actually occupied by Arizona Title Agency or Lenders' First Choice).

[47]  *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

due diligence after August 5, 2008, and he considered the sale "a done deal."[48]
Mr. Edward Peebles, FNF's assistant controller and Mr. Peter Sadowski, FNF's
vice president and chief legal officer both testified they were at Mercury's offices
in Denver for the August 5, 2008 negotiations, and suspected dark office liability
existed; Peebles acknowledged the data regarding dark office leases was
available.[49]  Moreover, FNF's chief financial officer, Mr. Tony Park, noted
Hauptman had informed FNF's representatives about the possible dark office
liability when he was asked.[50]

FNF cannot have it both ways.  The Court finds the evidence shows the
SPA was negotiated with both parties knowing that the information available
was not perfect.  However, the circumstances of the negotiations and the
benefits of the immediate sale created reasonably equivalent value.  FNF cannot
avoid paying the negotiated value in hindsight, based on information it could
have obtained before closing the deal.  FNF knew it was getting a good deal, and
it recognized the risk that the Colorado Subsidiaries might not end up being
exactly as they understood them to be on August 5, 2013.[51]  This risk was
expressed both in a negative way, with the presence of dark office and other
potential liabilities, and in a positive way, with the presence of the previously
unknown Oregon title office and previously unknown cash in the bank accounts
of the Colorado Subsidiaries.  The SPA provided FNF with ample time to request
more information and to work with Mercury in obtaining more information, but
does not state any negative information forgives payment of the rest of the
sales price.[52]

For these reasons, the Court finds FNF breached the terms of the SPA and
did not continue to act in the good faith it had shown during negotiations.  FNF
also breached the implied covenant of good faith and fair dealing.  Therefore,
the Court will order FNF to fulfill the terms of the SPA by finding in favor of
Mercury in the amount of the $2,515,996, plus prejudgment interest from

---

[48]  Transcript, p. 1118, lines 13-18, and p. 1130, lines 11-14, March 6, 2013.

[49]  *See* Transcript, p. 807, lines 9-11 and p. 813, line 11 - p. 815, line 4, March 5,
2013 (testimony of Peebles) and Transcript, p. 680, line 19 - p. 681, line 17, March 1, 2013
(testimony of Sadowski).

[50]  Transcript, p. 1038, line 3 -  p. 1039, line 20, March 6, 2013 (testimony of Park).
See also Transcript, p. 190, lines 1-11, February 26, 2013 (testimony of Hauptman).

[51]  Defendant's Exhibit A, SPA, at ¶ 5.

[52]  *Id.* at ¶ 3.8.

August 5, 2008, through the date of the judgment on this Order,[53] at 5% per annum over the Federal Reserve discount rate, and post-judgment interest at the federal judgment rate.

### D. Did Mercury's $1.68 Million Payment to the Colorado Subsidiaries Constitute a Preference Under § 547, or, in the Alternative. a Fraudulent Conveyance Under § 548?

Mercury, in the ordinary course of its business, prepared both consolidated and individual monthly financial statements for itself and the Colorado Subsidiaries, including balance sheets and income statements.  Each Title Company subsidiary deposited its operating cash on a daily basis in its own bank account.

However, the evidence also shows Mercury commingled all operating cash from those subsidiaries on a daily basis.  At the end of each business day, all of the cash in the subsidiaries' accounts was swept into Mercury's operating account, titled solely in Mercury's name, known internally at Mercury as the "Concentration Account."  Funds from the Concentration Account not needed by Mercury were occasionally transferred to another interest-bearing account in Mercury's name.  At the beginning of each business day, sufficient monies were automatically transferred from the Concentration Account to each subsidiary's bank account so checks presented and other transfers from the account could be paid.

The majority of cash generated by Mercury's subsidiaries was held in a Mercury bank or investment account.  Mercury also used funds from the Concentration Account for its own operations and to pay its own bills.  There was no written or other agreement concerning this arrangement, and Mercury did not segregate any subsidiary funds in the Concentration Account from its own funds.  Moreover, Mercury's transfer of cash from the Concentration Account to a subsidiary was made without regard to amounts previously transferred to the Concentration Account for each subsidiary.  Mercury had complete control over the funds in the Concentration Account and unilaterally determined how and when funds were disbursed from the account.  The balance owed by Mercury to any given subsidiary, or from any given subsidiary to Mercury, varied from day to day depending upon whether the amounts transferred to the Concentration Account were greater or lesser than the amounts transferred to the subsidiary or advanced on the subsidiary's behalf

---

[53] *See Am. Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 13 (Del. Ch. 1992), *aff'd* 620 A.2d 856 (Del. 1992) (prejudgment interest, computed from the date of the breach, is a matter of right under Delaware law) and 6 DEL. C. § 2301(a): Where there is no expressed contractual rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate. . . .").

from the Concentration Account.  Thus, the Court finds overwhelming evidence to conclude Mercury commingled these funds.

As noted above, on July 25, 2008, all funds from the Concentration Account were swept, leaving a balance of zero.  Thereafter, Mercury and its subsidiaries began depositing most of their cash into a bank account titled solely in Mercury's name at Wells Fargo Bank, N.A. in Denver, Colorado (the "Wells Fargo Account").  After July 25th, the Wells Fargo account contained the commingled funds of these entities.

In late July and early August 2008, the following subsidiaries deposited the following amounts in the Wells Fargo Account:

American Heritage Title Agency, Inc. $1,131,065.90
Mercury Settlement Services of Utah, Inc. $ 42,456.00
United Title Company, Inc. $ 230,551.38
Security Title Guaranty Co. $1,013,383.38
USA Digital Solutions, Inc.  $ 38,094.65

On July 31, 2008, Wells Fargo Bank notified Mercury it no longer wanted Mercury's business. On the same date, Mercury set up individual operating accounts for each of the Colorado Subsidiaries at Centennial Bank in Centennial, Colorado.  On August 1, 2008, Mercury transferred the following amounts to four of the Colorado Subsidiaries' Centennial Bank accounts to provide them with immediate operating cash:

American Heritage Title Agency, Inc. $250,000.00
United Title Company, Inc. $100,000.00
Security Title Guaranty Co. $400,000.00
Title America, Inc. $250,000.00

On August 4, 2008, Mercury opened another bank account solely in its name at Centennial Bank (the "Centennial Account").  Again, Mercury commingled its funds and the funds of the Colorado Subsidiaries in Mercury's Centennial Account, and used the funds to pay its own debts, continuing the "Concentration Account" model it had prior to the July 25, 2008 sweep and early August change in banks. Mercury did not have a written agreement with the Colorado Subsidiaries with respect to the Centennial Account.

One of the first deposits into Mercury's Centennial Account was the initial $6,071,264.12, transfer from the Wells Fargo Account.  As of August 5, 2008, (the day FNF purchased the Colorado Subsidiaries) and after accounting for certain other transfers and bookkeeping entries, the total amount of

$1,685,943.76 was on deposit in the Wells Fargo Account allegedly comprised of separate subsidiary funds as follows:[54]

American Heritage Title Agency, Inc. $ 861,698.35
Mercury Settlement Services of Utah, Inc. $ 42,456.00
United Title Company, Inc. $ 130,551.38
Security Title Guaranty Co. $ 613,383.38
USA Digital Solutions, Inc. $ 37,854.65

TOTAL: $1,685,943.76

Two or three days later, Bonnie Pitchford, an employee in Mercury's accounting department, informed McConville, Mercury's general counsel, about the funds held in the Centennial Account. Ms. Pitchford believed the funds should be transferred to the Colorado Subsidiaries. McConville, who was responsible for making many of Mercury's executive-level decisions, authorized the transfers. Therefore, on August 8, 2008, two days after the sale, Mercury transferred the above identified amounts (the "Colorado Subsidiary Transfers") from the Centennial Account to the Colorado Subsidiaries, now held by FNF.

    1.    *The Transfer Was Not a Preference Under § 547.*

The $1.68 million transfer to the Colorado Subsidiaries does not constitute a preference under § 547(b). Under § 547(b), a transfer is preferential if it 1) was made to or for the benefit of a creditor; 2) was for or on account of antecedent debt owed by the debtor; 3) was made while the debtor was insolvent; 4) was made on or within 90 days before the date of filing of the petition; and, 5) enables the creditor to receive more than such creditor would receive in a Chapter 7 case if the transfer had not been made.[55] The burden of proof is on Mercury to establish each of these elements.[56]

The parties stipulated the Colorado Subsidiaries are not creditors of Mercury.[57] Therefore, the Colorado Subsidiary Transfers could not have been made to or for the benefit of a creditor, and § 547 does not apply. Moreover, the Court finds the clear language of the parties agreement in the SPA,

---

[54] Mercury asserts it owed these funds to its subsidiaries. According to FNF, these funds were simply being "held."

[55] *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1196 (10th Cir.2 002); *Rodriguez v. Whatcott (In re Walker)*, 389 B.R. 746, 748 (Bankr. D. Colo. 2008).

[56] *Bailey* at 1196; § 547(g).

[57] Pretrial Statement, Stipulated Facts ¶ 67.

paragraph 9, eliminates debts Mercury may have owed to the Colorado Subsidiaries:

> 9. Intercompany Accounts. Effective as of the Closing Date, all intercompany accounts the one hand, and Seller and its affiliates (other than the Purchased Companies and their subsidiaries), on the other hand, shall be eliminated and released without payment of any amount. Such amounts shall include the 401(k) accounts accrued match payable.[58]

The Court notes this provision was effective as of the closing date, that is, August 5, 2008.  Accordingly, no debts were owed by Mercury to the Colorado Subsidiaries on the date of the Colorado Subsidiary Transfers, August 6, 2008, so no preference exists.

>     2.     *The Transfer Was a Constructive Fraudulent Conveyance Under § 548.*

As discussed above, a transfer may be found to be constructively fraudulent under § 548(a)(1) if it 1) was of an interest of the debtor in property; 2) the debtor received less than a reasonably equivalent value in exchange for the transfer; and 3) the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer.[59]  The parties have stipulated to Mercury's insolvency on the date of the Colorado Subsidiary Transfer.[60]  Therefore the remaining questions are whether Mercury owned the funds transferred and, if so, whether it received reasonably equivalent value in return for the transfer of the funds.

Deposits into a debtor's bank account are presumed to belong to the debtor.[61]  The United States Court of Appeals for the Tenth Circuit discussed the issue of ownership of funds in a commingled bank account as between a parent company and a subsidiary, finding, in the case before it, the funds were not property of a subsidiary's bankruptcy estate:

> In this case the concentration account was not only held exclusively in Amdura's name, but Amdura also possessed all other legally

---

[58]  Mercury's Exhibit A, Stock Purchase Agreement, p. 5, ¶ 9.

[59]  Section 548(a)(1)(B).

[60]  *See* Pretrial Statement, Stipulated Facts ¶ 56.

[61]  *Amdura National Distribution Company v. Amdura Corporation, Inc. (In re Amdura Corporation)*, 75 F.3d 1447, 1451 (10th Cir. 1996).

cognizable indicia of ownership.  None of the money in the account
was ever segregated; Amdura had, at least pre-petition, the right to
spend the money entirely as it saw fit without concern for "whose
money" it was spending; and Amdura in fact spent concentration
account funds on its own obligations as well as those of the
subsidiaries.  Even if the parties' own characterization of the account
were binding on this court, the record reveals no statements that
controvert the existence of these rights of ownership.[62]

Thus, the *Amdura* Court adopted three "indicia of ownership" for a court to
consider in determining whether a subsidiary has rebutted the presumption the
funds in a concentration account belonged to the parent entity.

First is whether the funds are segregated or commingled.  In this case,
the funds were commingled, and no segregation existed.[63]  In addition, Mercury
and the Colorado Subsidiaries had no agreement as to how the funds were to be
spent or accounted for.[64]  This indicates ownership and control by Mercury.
Second is whether a parent entity or company spent the money in the
commingled account without regard to the ownership of the funds.[65]  Here,
Mercury spent the funds at its sole discretion, and returned some of the funds
after it had used what it needed.  Accordingly, this test supports ownership by
Mercury.  Third is whether the parent company spent the funds to satisfy the
parent company's obligations, as well as those of the subsidiary.  The evidence
before the Court shows Mercury indeed spent the funds in the commingled
account to pay its own bills as well as obligations of the Colorado Subsidiaries.[66]
This indicator thus demonstrates ownership by Mercury. For these reasons, the
Court finds FNF has failed, under the *Amdura* factors, to rebut the presumption
Mercury owned the $1,685,943.76, and the Court concludes the disputed funds
were property of Mercury.

Since the Colorado Subsidiary Transfers were a transfer of property of
Mercury, the remaining question is whether Mercury received reasonably
equivalent value for the transfers.  As the Court has found above, the Colorado
Subsidiaries were not creditors of Mercury as of the date of the transfers,

---

[62] *Id.*

[63] *See* Pretrial Statement, Stipulated Facts ¶ 50.

[64] *Id.* at ¶ 52.

[65] *Id.* at ¶ 49; Transcript, February 26, 2013, p. 128, line 8–p. 129, line 19
(Testimony of Hauptman).

[66] *See* Pretrial Statement, Stipulated Facts ¶ 51.

pursuant to the SPA.  Therefore, in return for the transfer of funds Mercury owned, Mercury received nothing, and certainly not reasonably equivalent value.

For these reasons, the Court finds the August 6, 2008 payments in the amount of $1,685,943.76 constitute a fraudulent transfer and may be recovered.

## CONCLUSION

Based on the above findings of fact and conclusions of law,

IT IS ORDERED judgment shall enter in favor of the Defendants and against Mercury on Mercury's claim for avoidance of the transfer of the Colorado Subsidiaries.

IT IS FURTHER ORDERED judgment shall enter in favor of Mercury and against FNF on Mercury's claim for breach of the parties' Stock Purchase Agreement and breach of the implied covenant of good faith and fair dealing.

IT IS FURTHER ORDERED FNF shall turn over to Mercury the balance owed under the SPA, in the amount of the $2,515,996, plus prejudgment interest from August 5, through the date of the judgment on this Order, at 5% over the Federal Reserve discount rate, and post-judgment interest at the federal judgment rate.

IT IS FURTHER ORDERED judgment shall enter in favor of Mercury and against the Defendants on Mercury's claim for avoidance of its August 8, 2008 payments to the Colorado Subsidiaries in the amount of $1,685,943.76.

Dated March 31, 2014                                    BY THE COURT:

                                                        Michael E. Romero
                                                        United States Bankruptcy Judge