**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
**The Honorable Michael E. Romero**

| | |
|---|---|
| In re )| Case No. 08-23125 MER |
| )| |
| MERCURY COMPANIES, INC., )| Chapter 11 |
| )| |
| Debtor. )| |
| _____ )| |
| )| |
| MERCURY COMPANIES, INC., )| Adversary No. 10-01133 MER |
| )| |
| Plaintiff/Counter-Defendant, )| |
| )| |
| v. )| |
| )| |
| FNF SECURITY ACQUISITION, INC., )| |
| )| |
| Defendant/Counter-Claimant )| |
| )| |
| and )| |
| )| |
| FIDELITY NATIONAL TITLE COMPANY, )| |
| USA DIGITAL SOLUTIONS, INC., )| |
| AMERICAN HERITAGE TITLE )| |
| AGENCY, INC., and MERCURY )| |
| SERVICES OF UTAH, INC. )| |
| )| |
| Defendants. )| |

## ORDER

THIS MATTER is before the Court on the *Order Vacating Bankruptcy Court's Judgment and Remanding for Further Proceedings* [1] (the "Remand Order") entered by the United States District Court for the District of Colorado (the "District Court") and the *Order Directing Parties to File Briefs on Remand* (the "Briefing Order").[2]  The Court has reviewed the briefs on remand[3] and the

---

[1] *Mercury Companies, Inc. v. FNF Security Acquisition, Inc.*, 527 B.R. 438 (D. Colo. 2015).

[2] Docket No. 397.

[3] Pl.'s Br., (Docket No. 400); Def.'s Br., (Docket No. 399).

responses thereto[4] filed by Plaintiff Mercury Companies, Inc. ("Mercury") and Defendants FNF Security Acquisition, Inc., Fidelity National Title Company f/k/a Security Title Guaranty Co., USA Digital Solutions, Inc., American Heritage Title Agency, Inc., Mercury Settlement Services of Utah, Inc. and United Title Company, Inc. (collectively, "Fidelity"), and makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H) as it concerns proceedings to determine, avoid or recover preferences or fraudulent transfers.  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND FACTS

The factual findings in the Court's original trial order entered March 31, 2014 ("Trial Order"), were not disturbed by the District Court on appeal and this Court will not disturb its previous findings here.  Accordingly, the Court hereby incorporates all previous findings of fact as set forth in the Trial Order for purposes of this Order, and hereby reproduces only a portion of those findings as a summary.

In April 2008, Mercury executed a Credit Agreement with Comerica Bank ("Comerica") as part of a $45 million loan (the "Comerica Loan").  The Comerica Loan was secured by substantially all of Mercury's assets and the assets of its subsidiaries, including accounts receivable.  On July 25, 2008, Comerica swept Mercury's bank accounts and removed approximately $40 million of cash from those accounts.  The sweep significantly diminished Mercury's cash on hand.

On July 30, 2008, Mercury management decided to close numerous operating subsidiaries.  The decision was made for a variety of reasons, including the cash sweep by Comerica.  Mercury ceased operations at 161 locations and began downsizing employees in California, Texas, and Arizona. Mercury remained operating only through subsidiaries in Colorado (collectively, the "Colorado Subsidiaries").  At the time of the closures, Mercury anticipated a payroll of approximately $1.6 million to be paid on August 6, 2008.

---

[4] Pl.'s Resp. (Docket No. 402); Def.'s Resp. (Docket No. 401).

Prior to the sweep, four Colorado subsidiaries (collectively the "Colorado Subsidiaries") had a roughly 30% market share in Colorado.[5]  In other words, approximately 30% of all real estate transactions pending in Colorado were closed through the offices of the Colorado Subsidiaries.  In the minds of Mercury's management, this market penetration made the Colorado Subsidiaries an attractive candidate for a quick acquisition.

Mercury first attempted to sell the Colorado Subsidiaries to their largest underwriter, First American Title ("First American"), for $1 million on July 31, 2008.  First American declined the offer, although it remained in contact with Mercury regarding a potential sale.  Mercury also contacted Fidelity, another major national title insurance company, on August 1, 2008, and proposed a sale of the stock in the Colorado Subsidiaries for $5 million.

In its initial discussions with Fidelity, Mercury disclosed its cash shortfall and insolvency.  To conduct due diligence and continue its negotiations relating to a possible purchase of Mercury, Fidelity representatives traveled to Denver on August 4, 2008.  During the course of the day on August 5, 2008, Fidelity representatives and Mercury's management negotiated and executed a Stock Purchase Agreement ("SPA").  The SPA called for a purchase price of $5 million to be paid in cash, and Fidelity immediately wired $1 million of the purchase price directly to Mercury.  Fidelity took control of the Colorado Subsidiaries the same day.

On August 6, 2008, Fidelity wired an additional $1,484,004 toward the purchase price directly to Comerica, satisfying Mercury's outstanding obligations.  Comerica released any liens it had on the shares and the assets of the Colorado Subsidiaries.

After the Comerica release, all shares of the Colorado Subsidiaries were controlled by Fidelity free and clear of all liens and claims.  On August 28, 2008, twenty-three days after closing, Mercury filed its Chapter 11 petition, Case

---

[5] Specifically, the four Colorado Subsidiaries include:  Heritage Companies, Inc.; Security Title Guaranty Co.; Title America, Inc.; and USA Digital Solutions, Inc.  The Colorado Subsidiaries in turn owned all of the stock of six other sub-subsidiaries.  Except for USA Digital Solutions, Inc., all the Colorado Subsidiaries were engaged in the title business.  In addition to purchaser FNF, Mercury named the following purchased subsidiaries as defendants in this matter:  1) Security Title Guaranty Co. (now known as Fidelity National Title Company); 2) USA Digital Solutions, Inc.; 3) American Heritage Title Agency, Inc. a/k/a First American Heritage Title Agency; 4) Mercury Settlement Services of Utah, Inc.; and 5) United Title Company, Inc.

No. 08-23125, in this Court.  As of the petition date, $2,515,996 of the purchase price remained outstanding.

## PROCEDURAL HISTORY

### A.    The 2013 Trial

Mercury's Chapter 11 Plan of Reorganization was confirmed on December 13, 2010.  Earlier, on January 27, 2010, Mercury commenced this adversary proceeding against Fidelity, arising out of Mercury's sale of the Colorado Subsidiaries.  Mercury sought to recover the alleged value of the Colorado Subsidiaries as a fraudulent transfer under 11 U.S.C. § 548.[6]  Mercury also brought claims for breach of contract and recovery of preferential payments made to the Colorado Subsidiaries under § 547.

On March 31, 2014, following a trial on the merits, the Court issued its Trial Order, concluding as follows:

> IT IS ORDERED judgment shall enter in favor of the Defendants and against Mercury on Mercury's claim for avoidance of the transfer of the Colorado Subsidiaries.

> IT IS FURTHER ORDERED judgment shall enter in favor of Mercury and against [Fidelity] on Mercury's claim for breach of the parties' Stock Purchase Agreement and breach of the implied covenant of good faith and fair dealing.

> IT IS FURTHER ORDERED [Fidelity] shall turn over to Mercury the balance owed under the SPA, in the amount of the $2,515,996, plus prejudgment interest from August 5, through the date of the judgment on this Order, at 5% over the Federal Reserve discount rate, and post-judgment interest at the federal judgment rate.

> IT IS FURTHER ORDERED judgment shall enter in favor of Mercury and against the Defendants on Mercury's claim for avoidance of its August 8, 2008 payments to the Colorado Subsidiaries in the amount of $1,685,943.76.

---

[6]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

On April 30, 2014, the Court issued an Order granting Mercury's Motion to Amend,[7] amending the original Judgment entered on March 31, 2014, to read in pertinent part as follows:

> Judgment is entered in favor of the Defendants and against Mercury Companies, Inc. on Mercury's claim for avoidance of the transfer of the Colorado Subsidiaries, namely Heritage Companies, Inc., Security Title Guaranty Co., Title America, Inc. and USA Digital Solutions, Inc.

> Judgment is entered in favor of Mercury Companies, Inc. and against FNF Security Acquisition, Inc. on Mercury's claim for breach of the parties' Stock Purchase Agreement and breach of the implied covenant of good faith and fair dealing in the amount of the $2,515,996, plus prejudgment interest from August 5, 2008, through the date of the judgment on this Order, at 5% over the Federal Reserve discount rate, in the total amount of $3,561,478.50 ($2,515,996.00 plus interest of $1,045,482.50 as of April 28, 2014) and post-judgment interest at the federal judgment rate.

> Judgment is entered in favor of Mercury Companies, Inc. and against the Defendants on Mercury's claim for avoidance in the amount of $1,685,943.76, plus prejudgment interest from August 5, 2008, through the date of the judgment on this Order, at 5% over the Federal Reserve discount rate, in the total amount of $2,386,511.47 ($1,685,943.76 plus interest of $700,567.47 as of April 28, 2014), and post-judgment interest at the federal judgment rate.

## B.    The Appeal to the U.S. District Court

Fidelity filed its Notice of Appeal on May 1, 2014, and Mercury filed its Notice of Cross-Appeal on May 13, 2014.  On March 19, 2015, the District Court issued the Remand Order.  The parties did not appeal the Remand Order.

The Remand Order, while vacating the Trial Order in its entirety, only remanded certain issues for further consideration.  Those issues were set out in detail in the Court's Briefing Order.  The District Court did not disturb this Court's findings regarding jurisdiction to enter final judgment on all issues; its findings of fact; its determinations regarding standing; or its ruling that the $1.6 million transfer between Mercury and its Colorado Subsidiaries was not a preference.  This Court's previous findings and conclusions on these issues stand as final, and the Court will not revisit those issues in this Order.

---

[7] Docket No. 362.

However, the District Court instructed this Court to reconsider the following issues:

1.      Whether Fidelity acted reasonably in refusing the pay the additional $2.5 million after receiving additional information from Mercury.

2.      Whether Mercury received reasonably equivalent value for the subsidiaries.

## C.      The Briefing Order

On June 10, 2015, the Court issued its Briefing Order to the parties.  In accordance with the Remand Order, the parties were requested to brief the following issues:

1.      As it relates to whether Fidelity breached the SPA or violated the implied covenant of good faith and fair dealing:

      a.      The definition of "fairly presents" in § 4.8 of the SPA;

      b.      Regardless of that definition, whether the Financial Statements (SPA, Schedule 4.8) fairly presented the financial condition and results of operations of the Purchased Companies as of June 30, 2008 (as set forth in SPA § 4.8);

      c.      Under § 3.8 of the SPA, whether Fidelity acted reasonably or unreasonably under the circumstances when it withheld its indication of satisfaction with the accuracy of Mercury's representation in SPA § 4.8 that Schedule 4.8 fairly presented the relevant financial information; and

      d.      In light of the SPA's structure reflecting the parties' intent to close quickly but hold back a portion of the purchase price subject to further review of information that Mercury was not willing to gather and present before execution, coupled with Fidelity's stipulations in SPA §§ 5.1 through 5.3, whether Fidelity had knowledge or suspicion of Mercury's undisclosed liabilities prior to executing the SPA.

2.      As it relates to whether Mercury received reasonably equivalent value for the Colorado Subsidiaries, the fair market value of the subsidiaries Mercury sold to Fidelity, as considered in the context of whether the seller obtained reasonably equivalent value from the objective creditor's perspective, without regard to the subjective needs or perspectives of the debtor or transferee.

# DISCUSSION

## A.  Did Fidelity Act Reasonably in Refusing to Pay the Remaining $2.5 Million of the Purchase Price to Mercury?

Mercury claims Fidelity breached the SPA by failing to pay the $2,515,996 balance of the $5 million purchase price.  This remaining amount was subject to a hold back in the SPA which allowed Fidelity to review and indicate its satisfaction with post-closing financial information to be provided by Mercury. Fidelity asserts it is excused from paying the balance because information provided after closing indicated the financial statements provided at the time of execution of the SPA were false and did not fairly present Mercury's financial condition.

At trial, this Court found Fidelity breached the SPA by failing to pay the remainder of the purchase price. On appeal, the District Court determined this Court's interpretation of Section 3.8 of the SPA to be mistaken, and vacated certain of the Court's findings.[8]  In accordance with the Remand Order, this Court now considers "whether Fidelity reasonably refused to indicate its satisfaction with" the information provided by Mercury under Section 3 of the SPA.  If Fidelity's refusal was *not* reasonable, then the Court must find Fidelity breached the SPA and the covenants of good faith and fair dealing.[9]

The SPA provided for a $5 million purchase price for the shares in the Colorado Subsidiaries.  One million dollars was to be delivered to Mercury upon execution of the SPA, with the balance to be paid as follows:

---

[8]  District Court Order pp. 9-10.

[9]  Def.'s Ex. A, SPA, p. 7, ¶ 12. To establish a breach of contract under Delaware law, a plaintiff must demonstrate:  1) a contractual obligation; 2) a breach of the obligation by the defendant; and 3) resulting damage to the plaintiff. *See, e.g., Greenstar, LLC v. Heller*, 814 F.Supp.2d 444, 450 (D. Del. 2011); *VLIW Tech, LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) (Not Reported in A.3d). In addition, Delaware law recognizes a covenant of good faith and fair dealing which "inheres in every contract" governed by Delaware law and requires parties to a contract to avoid unreasonable or arbitrary actions which prevent the other party from receiving the "fruits of the bargain." *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 636 (Del. Ch. 2011).

> 3.  Seller Post-Closing Deliverables; Payment of Deferred Portion of Purchase Price. On or before August 19, 2008. Seller will deliver the following to Buyer (together, the "Schedules"):
>
> . . .
>
> > 3.4 A schedule of all liabilities of the Purchased Companies in excess of $50,000.
>
> . . .
>
> Buyer will promptly review the Schedules upon delivery, and Buyer and Seller will work together in good faith to revise the Schedules to the extent appropriate based on Buyer's review as soon as practicably but in no event later than the 14th day following delivery of the Schedules. Upon Buyer's indication of satisfaction with the Schedules, which indication will not be unreasonably withheld, and the accuracy of Seller's representations and warranties contained herein, Buyer will pay the balance of the Purchase Price to Seller.

In addition to its promise to provide additional financial information, Mercury represented in § 4.8 the SPA that the financial statements attached thereto as Schedule 4.8 "fairly present the financial condition and results of operations of the Purchased Companies as of the date thereof and for the periods covered thereby."

There is no dispute Fidelity did not pay Mercury approximately $2.5 million.  However, Fidelity argues § 4.8 of the SPA was breached by Mercury because the financial statements presented by Mercury failed to disclose approximately $8.6 million in "dark office" liabilities, which includes $3.8 million in contingent guaranty liabilities potentially owed by the Colorado Subsidiaries.[10] Accordingly, because the financial statement did not "fairly present" the financial condition of the Colorado Subsidiaries, Fidelity asserts it was not required to pay the remainder of the purchase price.

---

[10] At trial, Fidelity argued the failure to disclose several million dollars in "dark office" liabilities also excused its breach.  However, Fidelity abandoned this argument on remand and focuses solely on the contingent guaranty liability of the non-Colorado entities.  Out of an abundance of caution, the Court will nonetheless address the dark office liability issue.

1.    The Definition of "Fairly Present"

To determine the meaning of "fairly present" as set forth in § 4.8 of the SPA, the Court "must give priority to the parties' intentions as reflected in the four corners of the agreement."[11]  In doing so, the Court "must construe the agreement as a whole, giving effect to all provisions therein."[12]  The meaning derived from a single contract provision "cannot control the meaning of the entire agreement if such inference conflicts with the agreement's overall scheme or plan."[13]

Clear and unambiguous terms will be construed according to their ordinary meaning.[14]  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[15]  The fact that parties may vehemently disagree upon the construction of a contract term does not render a provision ambiguous.[16]  It is solely up to the court to determine "whether the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings."[17]

Here, the parties do not agree on the meaning of "fairly present." Mercury argues "fairly present" must be taken in the context of the SPA and "can only mean that the Financial Statements were presented as maintained in the ordinary course, without falsification, and as relied upon by management."[18] Fidelity, in turn, refers to the definitions contained in Black's Law Dictionary and Merriam-Webster Dictionary to argue that "fairly present" means whether the Financial Statements "equitably, honestly, impartially, reasonably, and with

---

[11] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-1160 (Del. 2010).

[17] *GMG,* 36 A.3d at 780. *Osborn*, 991 A.2d at 1160.

[18] Mercury Remand Br. p. 19.

substantial correctness presented the financial condition and results of operations of the Purchased Companies as of June 30, 2008."[19]

"Fairly present" is not a defined term in the SPA.  However, the Court finds the term "fairly present" is clear and unambiguous and should be ascribed its ordinary meaning as set forth in Black's and Merriam-Webster: whether the Financial Statements made available presented the Colorado Subsidiaries' information "equitably, honestly, impartially, reasonably, and with substantial correctness."  Further, no SPA provision requires the Financial Statements be "kept in the ordinary course" and "as relied upon by management;" but the Court believes such considerations carry weight as to whether the Financial Statements fairly presented the financial condition of the Colorado Subsidiaries. Finally, Delaware law instructs the Court to apply the definition of "fairly present" in harmony with the remainder of the provisions of the SPA.[20]

2.    *The Financial Statements Provided in Schedule 4.8 of the SPA Fairly Presented the Financial Condition and Results of Operations of the Purchased Companies as of June 30, 2008.*

The Court has determined that "fairly present" is unambiguous and its ordinary meaning is to be applied.  Therefore, the Court will not compare the content of the Financial Statement to outside accounting standards such as GAAP, which are not referenced by the SPA.  Instead, the Court will simply ascertain whether the information provided was equitable, honest, impartial, reasonable, and substantially correct as it relates to Mercury's financial position on June 30, 2008.

As an initial matter, there is no dispute the information provided in the Financial Statements was honest and accurate. Rather, Fidelity takes issue with what information was *not* provided – approximately $8.6 million in alleged dark office lease liability, including contingent lease guaranty liabilities for non-Colorado entities.  Fidelity asserts these omissions constitute material misstatements which skewed the picture of Mercury's financial situation in such a way that Fidelity's liabilities "ballooned," effectively destroying the benefit of its bargain.

However, Mercury argues the listed liabilities were fairly presented as of the date of the Financial Statements – June 30, 2008 – and Fidelity was aware

---

[19] Fidelity Remand Br. p. 3.

[20] *GMG Capital Investments,* 36 A.3d at 780 (Del. 2012).

at the time of closing of the substantially negative events that had occurred since that date, including the July 25, 2008 sweep of cash in its bank accounts. Mercury also points to § 5.2 and § 5.3 of the SPA, in which Fidelity represented it was capable of evaluating the merits and risks of the acquisition, had the opportunity to ask questions concerning the financial and other affairs of the Colorado Subsidiaries, and received satisfactory answers.

The weight of the evidence demonstrates the Financial Statements were fairly presented by Mercury as of June 30, 2008.  Specifically, all lease payments being made by the Colorado Subsidiaries as of June 30, 2008 — regardless of whether the leases were "dark" or the payments were solely the result of guaranties — were counted as "occupancy expenses" on the Financial Statements.  Further, Fidelity admits $5.7 million of the $8.5 million in allegedly undisclosed lease expenses only became direct liabilities of Mercury *after* June 30, 2008.  In addition, Mercury presented a reasonable explanation for why any dark leases were not also listed as liabilities on the June 30 balance sheet — it followed a policy previously created in conjunction with its auditor, KPMG, to determine how to conduct its reporting.[21]  As to the lease guaranties for the non-Colorado subsidiaries, Mercury offered evidence that there were no active obligations as of June 30, 2008, nor was there a probability of an active obligation until the cash sweep by Comerica on July 25, 2008.[22]

Fidelity points to several cases in support of its argument that the failure to disclose guaranteed liabilities constitutes a materially false financial statement.  However, the authority cited for this proposition is not relevant because the cases pertain solely to dischargeability proceedings involving borrower fraud in obtaining credit.[23]  While omission of such information *could* cause a financial statement to be incorrect or dishonest in the merger and

---

[21] Walsh Tr. 362:19-365:19

[22] Pl.'s Ex. 124 at 6-8. Relevant, but not determinative, is FAS 5, a standard promulgated by the Federal Accounting Standards Board (FASB) which provides that it must be "probable" that a liability had been incurred as of the date of the financial statement in order to warrant its inclusion.

[23] *See, e.g., Colorado East Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550 (Bankr. D. Colo. 2009) (dischargeability action related to omission on personal financial statement submitted in connection with application for business and personal loans); *Union Planters Bank, N.A. v. Martin (In re Martin)*, 299 B.R. 234 (Bankr. C.D. Ill. 2003) (dischargeability action related to materially false statement submitted in connection with application for loan); *Signet Bank v. Wingo (In re Wingo)*, 113 B.R. 249 (W.D. Va. 1989) (dischargeability action related to false financial statements submitted in connection with credit application to bank).

acquisition setting, Fidelity has failed to provide any evidence showing the Financial Statement in this case was dishonest or substantially incorrect as of June 30, 2008.  Instead, the evidence shows the Financial Statement was created in the ordinary course of business, not in anticipation of an acquisition, and nothing was manipulated for purposes of the SPA.[24]

Fidelity argues it requested Mercury to provide a list of contingent liabilities, and it relied upon Mercury's silence as an indication that no such liabilities existed.  However, the Court does not find this assertion credible because it hinges on the silence of Mercury in response to a single e-mail as an indication of the non-existence of guaranty liability.[25]  In the abbreviated period of time leading up to closing, there were many issues being addressed by the parties.  Fidelity warranted in § 5.2 of the SPA that it had an opportunity to ask questions regarding the financial and other affairs of the Colorado Subsidiaries and was satisfied with the answers.  Either Fidelity misinterpreted Mercury's silence or it determined it was comfortable proceeding without the information – in either case, Fidelity has only itself to blame.[26]

Ultimately, Fidelity admits the fatal flaw in its position – given the rush to close the deal, there simply was not enough time to absorb and understand the information being provided.  "Even under the best of circumstances, due diligence takes time – it takes a while to figure out who is who, to whom you can ask questions, and what to ask."[27]  The evidence here shows Fidelity was not uninformed – at a minimum, Fidelity suspected these "undisclosed" liabilities existed.[28]

---

[24] Walsh Tr. 404:18; Hauptman Tr. 179:9-11.

[25] Def.'s Br. 8.

[26] It is important to put the Court's analysis in a specific context – this transaction was conducted between two equally sophisticated parties who dealt with each other at arm's length.  It is certainly not the case that one party had disproportionate industry expertise and business acumen.  Both parties were capable of evaluating the merits and risks of this acquisition.

[27] Fidelity's Resp. Br. 23-24.

[28] As set forth on pages 21-22 of the Trial Order:

> [T]he testimony at trial indicates [Fidelity] was aware of dark office liability and had an opportunity to inquire about it and other possible contingent liabilities before closing on the SPA.  Specifically, Mr. Roger Jewkes, FNF's president of western operations, testified he was not expecting do any more due diligence after August 5, 2008, and he considered the sale a "done deal."

This Court must construe § 4.8 of the SPA in a way that honors the plain meaning of the provision *and* gives priority to the intentions of the parties as demonstrated in the entirety of the SPA.  A fair reading of the SPA shows both parties intended a quick sale and acknowledged they were proceeding with unusually expedited due diligence in order to close the sale.

In the context of the SPA, which required further disclosure of financial information after closing, it cannot be said the financial statement was intended to be an all-encompassing view of the Colorado Subsidiaries' financial picture.  Instead, it appears it was intended to be a starting point.  Prior to executing the SPA, Fidelity had a chance to review the Financial Statement and its contents, as well as ask all questions it deemed necessary before closing.  Fidelity represented it received satisfactory answers.  Based on the lack of evidence the Financial Statement was substantially inaccurate or dishonest, this Court finds any "surprises" post-closing were an inherent risk of the transaction.

For these reasons, the Court finds the financial statements provided by Mercury fairly presented the financial condition of the Colorado Subsidiaries, and Fidelity did not act reasonably in refusing to pay the balance of the purchase price to Mercury.  Thus, the Court further finds Fidelity breached the terms of the SPA and the covenants of good faith and fair dealing after the SPA's execution.

## B.    Did Mercury Receive Reasonably Equivalent Value from the Objective Creditor's Perspective, When Taking Into Account Fair Market Value?

Mercury agreed to sell the Colorado Subsidiaries to Fidelity for $5 million.  Post-petition, Mercury now claims the transaction was a fraudulent transfer under § 547 because it did not receive reasonably equivalent value in exchange for the sale.  Mercury claims the Colorado Subsidiaries had a fair market value of $15,627,884 as of the date of the sale.

On appeal, the District Court vacated this Court's finding Mercury received reasonably equivalent value in exchange for the sale of the Colorado Subsidiaries.  However, the District Court affirmed this Court's use of the three-

---

Mr. Edward Peebles, FNF's assistant controller and Mr. Peter Sadowski, FNF's vice president and chief legal officer both testified they were at Mercury's offices in Denver for the August 5, 2008 negotiations, and suspected dark office liability existed; Peebles acknowledged the data regarding dark office leases was available.  Moreover, FNF's chief financial officer, Mr. Tony Park, noted Hauptman had informed FNF's representatives about the possible dark office liability when he was asked.

factor test set forth in the *Fruehauf Trailer* case and did not disturb this Court's findings that the transaction was conducted at arm's length and in good faith.[29] With respect to reasonably equivalent value, the District Court has instructed this Court to reconsider only the fair market value of the benefit received "from the objective creditor's perspective, without regard to the subjective needs or perspectives of the debtor or transferee."[30]

At the outset, the Court notes that, even when evaluating fair market value solely from the objective creditor's perspective, experts often disagree on the appropriate valuation of corporate properties, "even when employing the same analytical tools."[31]  Unsurprisingly, reasonable minds can and do often disagree as to valuation issues.  "This is because the output of financial valuation models are driven by their inputs, many of which are subjective in nature."[32]  As a result, determinations of reasonably equivalent value are largely fact-intensive.[33]

Many courts have determined "when sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."[34]  With this perspective in mind, this Court considers reasonably equivalent value.

---

[29] *See Pension Transfer Corp. v. Beneficiaries (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-213 (3rd Cir. 2006) (In conducting this factual analysis, a court does look to the "totality of the circumstances," including 1) the "fair market value" of the benefit received as a result of the transfer, 2) "the existence of an arm's-length relationship between the debtor and the transferee," and 3) the transferee's good faith.").

[30] The Court has previously noted Mercury's management erred in certain of its beliefs leading up to the transaction, including that it did not have sufficient cash on hand to make payroll and immediate punitive action by the Colorado Department of Insurance was a near-certainty.  These subjective perspectives are not determinative on remand.

[31] *Peltz v. Hatten (In re USN Liquidating Trust)*, 279 B.R. 710, 737-738 (D. Del. 2002).

[32] *Id.*

[33] *In re MDIP, Inc.*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) (citing 5 COLLIER ON BANKRUPTCY 548.05 (15th ed. rev. 2005) ("Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.")).

[34] *Id.  See also In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) *aff'd In re Hechinger Inv. Co. of Delaware, Inc.*, 278 F. App'x 125 (3rd Cir. 2008) ("Moreover, because valuation is, to a great extent, a subjective exercise dependent upon the input of both facts

Here, the parties agree fair market value is "the amount at which property would change hands between a willing buyer and a willing seller if neither is under compulsion and both have reasonable knowledge of the relevant facts."[35]  However, each party offered conflicting expert witness testimony at trial concerning the value of Mercury.  While both experts agreed on many points in reaching their opinions, their values of Mercury were vastly different.  Mercury's expert maintains the Colorado Subsidiaries had a fair market value of roughly $15 million at the time of sale; Fidelity's expert opined fair market value was $2.5 million.  A number of lay witnesses also testified at trial concerning the state of business operations at the time of the transfer; the impact of that testimony is also hotly disputed.

The Court previously stated it believes the sale price of the Colorado Subsidiaries might have been higher if Mercury had not been insistent on an immediate sale.  However, the Court cautioned that Mercury had not presented sufficient evidence to show the price would have increased by $10 million.[36]  The Court found both parties' experts offered useful – but not determinative – testimony at trial.

On remand, Mercury argues its expert, Mr. Demchick, provided the only evidence of the fair market value of Mercury, and therefore, Mercury's value should carry the day.  According to Mercury, the difference between Mr. Demchick's value and the contract price stems from subjective factors such as Mercury management's mistaken understanding of the amount of cash available and the fear of immediate punitive action by the Colorado Department of Insurance.  However, as addressed in the Remand Order, the subjective perspective is inapposite.

Rather, from an objective creditor's standpoint, the Court is persuaded that negative circumstances existed that were not fully taken into account by Mr. Demchick's analysis and that have a significant impact on Mercury's value.  These include:

- The Comerica cash sweep and subsequent closure of non-Colorado subsidiaries;[37]

---

and assumptions, the court will give deference to prevailing marketplace values . . . rather than to values created with the benefit of hindsight for the purpose of litigation.")

[35] Tr. Order p. 18.

[36] Tr. Order p. 10.

- The fact that at least twenty-seven major lender customers stopped giving the Colorado Subsidiaries their business;[38]
- The likelihood of a "mass exodus" of employees from the Colorado Subsidiaries if a sale did not occur;[39] and
- The ability of First American to block a sale to a third party.[40]

Mr. Demchick's valuation almost entirely skirts the events occurring between July 25, 2008, and August 5, 2008, and, as a result, the Court confirms its previous conclusion that his $15 million valuation is excessive.

Much, if not all, of the "value" in a title company's business is the relationships it has established with its employees and its clients.[41]  As of the date of the sale to Fidelity – setting aside Mercury management's subjective fears and worries – objective evidence exists that some of these relationships had been terminated and others were very much at risk.

For example, Elaine Vincent, president of American Heritage Title Company, one of the Colorado Subsidiaries, testified the effect of the July 2008 cash sweep and subsequent closing of other Mercury operations was "devastating" to her company.  Although American Heritage was able to convince "some" customers to stay with the company, "large lenders were notifying [American Heritage] that they would not fund to our trust account, therefore, we couldn't close if we didn't have the funds, so many of the larger lenders, as they started to continue to filter through the system, more and more [customers] were calling [and] requesting to move the file."[42]

John Longo, former president of Security Title Guaranty Co. (which also controlled United Title Company, Inc., one of the Colorado Subsidiaries) testified

---

[37]  Mr. Demchick took a 10% discount for marketability based on business conditions following the Comerica sweep.  In contrast, Fidelity's expert, Mr. Peltz, found that a 30% discount was more appropriate.

[38]  Def.'s Ex. D, ¶ 7.  These lenders included Chase Home Mortgage, Countrywide Home Loans, ENT Federal Credit Union, American Sterling Bank, Franklin American, Security State Bank, Megastar Financial, Aspen Funding, Assurity Financial Services, Nattymac, and Direct Mortgage, among others.

[39]  Longo Tr. 1309:25-1310:19.

[40]  Def.'s Ex. 6B; Demchick Tr. 1632:11-17.

[41]  Hauptman Tr. 149:2-23, 214:9-12; Def.'s Br. 14.

[42]  Vincent Tr. 1271:21-1272:16.

the effect of the July 2008 cash sweep and subsequent closures had a substantially negative impact on the businesses which was "certainly worse" than he anticipated. According to Mr. Longo, "Employees were now talking about, [s]hould we be leaving? Clients, certainly, we were talking to on a daily basis, trying to, in certain cases, help them transfer their files [to other title companies], and [in] other cases trying to assure them that we're doing everything we can to stabilize . . . . "[43]  Even disregarding his subjective fears and misapprehensions, Mercury's own President admitted closing the non-Colorado operations had a negative effect on the Colorado Subsidiaries.[44]

Mercury contends all these events were not serious – and points out all the customers who left subsequently returned to the Colorado Subsidiaries. However, Mercury ignores the fact the customers returned *after* the sale to Fidelity.  The evidence shows these customers returned *because of* the sale, not in spite of it.  As even Mr. Hauptman admitted, the problem was "Mercury," not the subsidiaries.[45]  An outside company such as Fidelity was uniquely positioned to add immediate value to the Colorado Subsidiaries – a fact also admitted by Hauptman.[46]

Moreover, the Court notes for purposes of determining reasonable equivalence, the critical date is the date of the transfer.[47]  It is apparent to the Court that, on August 5, 2008, the value of $15 million proposed by Mr. Demchick did not exist independent of a sale.  For these reasons, the Court cannot find the fair market value of Mercury is $15,627,884.

As to the valuation evidence from Mercury, this leaves the Court with Mr. Hauptman's testimony that the $5 million purchase price offered was a "substantial discount" on Mercury's value in order to obtain an immediate sale.[48]

---

[43]  Longo Tr. 1306:10-19.

[44]  Hauptman Tr. 162:14-20.

[45]  Hauptman Tr. 149:2-12, 158:1-4 (Testifying that "the problem wasn't the subsidiaries. The problem was Mercury and – Mercury was the problem and the weight dragging them down.")..

[46] Hauptman Tr. 166:4-7 ("And Fidelity or any other title company knows exactly what to do in terms of operating companies.  What they need is revenue.  The expense part's easy for them to manage.").

[47]  *Peltz,* 279 B.R. at 737.

[48]  Hauptman Tr. 164:12-14.

Based on this testimony, the value of the Colorado Subsidiaries was likely greater than $5 million, and $5 million provides a floor for determining reasonable equivalence.

The evidence presented by Mercury at trial does not support a finding the sale price of the Colorado Subsidiaries would have been high enough to remove the $5 million price from the realm of reasonably equivalent value. For example, First American declined an immediate purchase of the Colorado Subsidiaries for a mere $1 million and apparently expressed concern about certain liabilities of the companies, including dark office liabilities.[49] The Court also notes Mercury presented no evidence the pool of potential buyers would have increased beyond First American and Fidelity if the sale period had been prolonged.[50] Further, in discounting value for marketability purposes, Mercury failed to take into account the fact that First American was required to consent to any sale of all or a significant part of Mercury's assets. Even Mr. Demchick agreed at trial this would be a factor to "overcome."[51] Finally, although the Court acknowledges Mercury had access to sufficient cash to meet the August 6, 2008 payroll and was not likely to face immediate shutdown by the Colorado Department of Insurance, Mr. Demchick did not provide any evidence showing Mercury could have continued to operate another 30 to 60 days – one of the fundamental inputs on which his valuation rests.[52]

However, Fidelity's expert valuation also is not without its flaws. The opinion of Fidelity's expert, Mr. Peltz, fails to take into account the various misjudgments by Mercury's management and assumes an immediate sale was required, when the record clearly reflects it was not.[53] Just as timing was a fundamental input to Mr. Demchick's valuation, so too does Mr. Peltz's assumption damage the credibility of his valuation. However, the Court finds

---

[49] Hauptman Tr. 313:17-316:6.

[50] Demchick Tr. 1642:1-21. Mr. Demchick testified the market for the Colorado Subsidiaries was likely limited to the five major title companies – First American and Fidelity being two of the five. He further testified he did not speak with the other three companies and had no evidence they would have been interested in participating in the sale.

[51] Hauptman Tr. 1630:1-1633:22.

[52] Demchick Tr. 1537:21-1540:19. Mercury suggests in its response brief that if the Court takes issue with its valuation at the 30-45 day timeframe, then the Court should simply use the discount of 30% applied by Fidelity's expert, Mr. Peltz, to account for an immediate sale.

[53] Tr. Order 16-17.

Mr. Peltz correctly considered many of the objective facts surrounding the sale, such as actual loss of business and risk of losing employees.  It is difficult – if not impossible – to separate the impact of the subjective perspectives of management and the objective reality in Mr. Peltz's appraisal.  Nonetheless, it is clear to the Court that a value of $2.5 million falls well short of reality in this case.

Therefore, this Court must determine the value of Mercury at the time of sale, weighing the conflicting evidence presented by the parties.  This is no easy task, as neither expert report is wholly determinative.  However, the Court has identified two applicable factors – the "lack of marketability" discount and the capital structure included in the weighted average cost of capital calculation – to base the adjustment of Mr. Demchick's valuation to what the Court believes is an appropriate ceiling on value.

Mr. Demchick's valuation contained a 10% discount for "lack of marketability."[54]  The discount was described as "net of control premium," meaning Mr. Demchick took into account Mercury was selling 100% ownership of its shares in the Colorado Subsidiaries.  According to Mercury, "the concept of a control premium is that a controlling interest in a company is worth more than a minority interest because a controlling interest permits the shareholder to exercise certain rights with respect to the company."[55]  In other words, "[t]he more control one has, the more marketable the shares are."[56]  Mr. Demchick's discount also assumed Mercury could continue as a going concern for "30 to 60 days" in order to market and sell the company.[57]  In contrast, Mr. Peltz applied a flat 30% discount for lack of marketability, which he based objectively on the fact an immediate sale occurred.

The Court finds that Mr. Demchick's 10% discount was too low.  Although Mercury was selling 100% ownership of the Colorado Subsidiaries, it did not have as much control over the shares and the Colorado Subsidiaries as the figure may suggest.  This is because Mercury was required to obtain the consent of First American prior to any sale.  Mr. Demchick admitted at trial that he was not aware of the contractual obligation with First American and did not consider it in his analysis.  Additionally, Mercury presented no evidence showing it could

---

[54]  Pl.'s Br., Ex. 1, p. 16-17.

[55]  Pl.'s Br., Ex. 1, p. 16-17.

[56]  Pl.'s Br., Ex. 1, p. 16-17.

[57]  Pl.'s Br., Ex. 1, p. 17; Demchick Tr. 1537:21-24.

continue as a going concern for the 30 to 60 days upon which Mr. Demchick premised his valuation. Therefore, the Court finds the control premium applied by Mr. Demchick was unfounded and the lack of marketability discount he applied was inaccurate.

In its brief, Mercury invites the Court to use the 30% discount for lack of marketability as applied by Mr. Peltz, should the Court take issue with the assumptions on timing utilized by Mr. Demchick. For the reasons previously stated, the Court finds it appropriate to consider the sale as it actually happened – immediately. Therefore, the Court will apply the suggested 30% discount to Mercury's valuation, thereby reducing the value ceiling to $11,704,960.

Additionally, the Court finds that Mr. Demchick utilized an incorrect capital structure which inflated the Colorado Subsidiaries' value by $3.28 million. On remand, Mercury admits Mr. Demchick's projected capital structure "is based upon what a hypothetical buyer would hold, not what the Title Companies or Mercury historically held," which Mr. Demchick considered irrelevant.[58] However, for purposes of valuation, "any comparative analysis should be considered together with a review of the company's *specific* and *relative* financial situation, including review of elements such as cash flow, collateral coverage, debt to equity ratios . . . . [T]he practitioner should consider adjustments for any *unique circumstances associated with the subject company*, with a view toward capital structure optimization."[59] Although Mercury's expert testified he did a "sanity check" of his selected debt structure of 30.28% against the historical structure of the Colorado Subsidiaries' three title companies, his figure was exclusively derived on industry standards selected from various literature.[60] Specifically, Mr. Demchick selected 30.28% as a middle ground between the 6.38% then-current year mean and the five-year average of 36.83% contained in the Ibbotson Cost of Capital Yearbook.[61]

---

[58] Pl.'s Br., Ex. 1, p. 12-13.

[59] *Bachrach Clothing, Inc. v. Edgar H. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 868 (Bankr. N.D. Ill. 2012) (citing CONTESTED VALUATION IN CORPORATE BANKRUPTCY: A COLLIER MONOGRAPH, ¶ 8.05[1] (Robert J. Stark et al. eds., 2011)).

[60] According to Mr. Demchick, he considered the historical debt of the title companies to be between 25% and 30%, in the form of intercompany payables. However, he also admitted "the individual title companies themselves did not hold debt. The debt was held at the Mercury level." Demchick Tr. 1502:4-13.

[61] *See* Pl.'s Br., Ex. 1, p. 12-13.

In contrast, Mr. Peltz considered the unique circumstances then-experienced by Mercury and the title industry as a whole. Mr. Peltz testified the financial distress of Mercury and many other title companies – caused by an industry "in a freefall" – made the ability to achieve or get long term capital "highly questionable."[62]  In this context, Mr. Peltz considered "the companies themselves" and "some figures from the industry to see what typical . . . capital structures would be."[63]  Mr. Peltz found "historically, the Colorado companies did not have very much long term debt . . . [and] the industry didn't really require a lot of long term debt."  As a result, Mr. Peltz determined the weight of debt should be 6.38%, which was the then-current year mean contained in the Ibbotson Cost of Capital Yearbook.

The Court finds Mr. Peltz's capital structure analysis is more reasonable than that of Mr. Demchick because he considered the unique circumstances associated with the Colorado Subsidiaries and the title industry as a whole, rather than using only book values to arrive at a conclusion.  While the Court acknowledges Mercury seemingly held debt on behalf of its title companies as a proxy, the Court finds – as to the Colorado Subsidiaries themselves and given industry conditions – Mr. Peltz's calculation more closely adheres to the proper legal standard of relying upon a company's actual capital structure to apportion debt and equity.

Accounting for the $3.2 million difference between Mr. Demchick's and Mr. Peltz's capital structure, Mercury's valuation of the Colorado Subsidiaries is further reduced to approximately $8,504,960.  While the Court has identified a number of other issues upon which Mr. Demchick's valuation is not determinative, the Court believes $8.5 million represents the maximum value which it can ascribe to the Colorado Subsidiaries based upon the evidence presented.

Ultimately, however the burden of proof rests with the party seeking to unwind the transaction; in this case it is Mercury asserting it has not received reasonable value.[64]  Mercury has not proved the Colorado Subsidiaries were

---

[62]  Peltz Tr. 1772:11-16.

[63]  Peltz. Tr. 1778:1-5.

[64]  *Wagner v. Galbreth*, 500 B.R. 42, 51 (Bankr. D.N.M. 2013) ("Constructive fraud under 11 U.S.C. § 548(a)(1)(B) requires the Plaintiff to establish that the debtor "received less than reasonably equivalent value in exchange for the transfer . . . . .  The plaintiff bears the burden of demonstrating that the transferor received less than a reasonably equivalent value in exchange for the transfer.").  *See also Parks v. Perseis and Associates, LLC (In re*

worth $15 million at the time of the sale.  While the Colorado Subsidiaries might well have been worth more than the $5 million purchase price agreed upon by Fidelity, the weight of the evidence shows much of the value realized by Fidelity resulted from its position in the marketplace and not necessarily the Colorado Subsidiaries' pre-sale condition.  Based on the evidence before it, this Court finds a reasonable range of value to be between $5 million and $8.5 million.

Having established a range of value between $5 million to $8.5 million, the remaining issue before the Court is "whether the recovery the debtor's creditors could legitimately expect to realize from the asset received by the debtor is reasonably equivalent to the value of the asset transferred by the debtor."[65]  Fair market value is a critical component of this analysis. Furthermore, "[i]n non-public market transactions particularly, courts do not insist that equivalence of exchange be determined to the penny, or viewed with the benefit of post-transfer history, a position in accordance with Congress's choice to qualify 'value' by the phrase 'reasonably equivalent.'"[66]

Here, the Debtor agreed to sell the Colorado Subsidiaries for $5 million and, in exchange, parted ways with entities worth between $5 million and $8.5 million.  Based on the evidence presented in this case, the Court concludes the sale price falls within the range of "reasonably equivalent value."  Jurisprudence addressing reasonably equivalent value recognizes a buyer can "get a good deal, even a great deal, but not an obscene deal at the expense of the debtor's creditors."[67]  Taking into account the totality of the circumstances – fair market

---

*Kinderknecht)*, 470 B.R. 149, 169 (Bankr. D. Kan. 2012) (holding that party seeking to set aside a transfer as constructively fraudulent bears the burden of proving the debtor received less than a reasonably equivalent value).

[65]  *In re Commercial Fin. Servs., Inc.*, 350 B.R. 559, 577 (Bankr. N.D. Okla. 2005).

[66]  5 COLLIER ON BANKRUPTCY ¶ 548.05[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing *Glendenning v. Third Federal Savings Bank (In re Glendenning)*, 243 B.R. 629 (Bankr. E.D. Pa. 2000) (noting "reasonably equivalent value" is far less strict and demanding than "present fair equivalent value" as used in 11 U.S.C. § 549(c)).  *See also Commercial Fin. Servs., Inc.*, 350 B.R. at 583-84 (stating with respect to value on the date of the transfer, the debtor "need not establish the exact value of the [transferred asset] in order to establish the element that they received *less than* reasonably equivalent value in exchange for their payments to [the transferee].") (citing *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565 (Bankr. N.D.N.Y. 1999) as an example of a court that did not determine the exact value of the asset sold by the debtor, merely that its value substantially exceeded the price paid by the defendant).

[67]  *In re Greater Southeast Community Hospital Corp. I*, 2012 WL 589269, at *13 (Bankr. D.D.C. Feb. 22, 2012) (Slip Copy).

value, the arms-length nature of the transaction, and the good faith of the parties – the Court can find no basis for unwinding the transfer.

Mercury cites several cases in which there are varying degrees of disparity between fair market value and purchase price – some smaller than this case – and the transactions were found by courts to not have reasonably equivalent value.  However, these cases are easily distinguishable.  None were commercial transactions with findings of good faith and arm's length;[68] some involved distinct issues of state law and family law clearly not analogous here.[69] Even if the value of the Colorado Subsidiaries were set at the $8.5 million ceiling, it is evident to the Court that Fidelity simply got a good deal, and there is no basis to unwind the transaction.

## CONCLUSION

For the reasons set forth in the Court's incorporated Trial Order and the reasons set forth herein,

IT IS ORDERED judgment shall enter in favor of all Defendants and against Mercury on Mercury's claim for avoidance of the transfer of the Colorado Subsidiaries, with each party to bear their own attorneys' fees and costs.

IT IS FURTHER ORDERED judgment shall enter in favor of Mercury and against FNF Security Acquisition, Inc. on Mercury's claim for breach of the parties' Stock Purchase Agreement and breach of the implied covenant of good faith and fair dealing in the principal amount of $2,515,996.00, plus prejudgment interest from August 5, 2008, through the date of the judgment on this Order at 5% over the Federal Reserve discount rate, plus post-judgment interest from the date of this Order at the federal judgment rate, with each party to bear their own attorneys' fees and costs.

---

[68] *See, e.g., In re Singh,* 434 B.R. 298, 310 (Bankr. E.D.N.Y. 2010) (holding that 10% of value received is not reasonably equivalent value in a case where the debtor made the transfer with the actual intent to hinder, delay, and defraud his creditors); *Lindell v. JNG Corp. (In re Lindell)*, 334 B.R. 249 (Bankr. D. Minn. 2005) (finding lack of reasonably equivalent value in case where court had already pierced the veil of the debtor's business in order to bring in assets to the estate); *Barnard v. Albert (In re Janitorial Close-Out Corp.)*, 2013 WI 492375 (Bankr. E.D.N.Y. 2013) (finding transfer related to Ponzi scheme lacked reasonably equivalent value because it was made with intent to hinder, delay, and defraud creditors.).

[69] *See, e.g., In re Chase*, 328 B.R. 675 (Bankr. D. Vt. 2005) (involving the compelling interest of the state of Vermont in protecting its strict foreclosure law); *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 249 (Bankr. D. Minn. 2005) (involving division of marital assets and value of the couple's former home).

IT IS FURTHER ORDERED judgment shall enter in favor of Mercury and against all Defendants on Mercury's avoidance claim in the principal amount of $1,685,943.76, plus prejudgment interest from August 5, 2008, through the date of the judgment on this Order at 5% over the Federal Reserve discount rate, plus post-judgment interest from the date of this Order at the federal judgment rate, with each party to bear their own attorneys' fees and costs.

Dated October 9, 2015                BY THE COURT:


Hon. Michael E. Romero, Chief Judge
United States Bankruptcy Court